UNITED STATES v. AMAZON INDUSTRIAL CHEMICAL CORPORATION et al.

Nos. 15026–15028.

District Court, D. Maryland.

Dec. 23, 1931.

Simon E. Sobeloff, U. S. Atty., of Baltimore, Md., and Leslie E. Salter, Sp. Asst. to Atty. Gen., for the United States.

Tydings, Levy & Archer, of Baltimore, Md., for American Solvents & Chemical Corporation of Delaware, American Solvents & Chemical Corporation of Maryland, American Solvents & Chemical Sales Corporation of Delaware, William Ulrich, Arthur P. Jell, American Oil & Supply Co., and John J. Butler.

Schimmel & Hettleman, of Baltimore, Md., for Aaron Eisenberg, Ben N. Eisenberg, and Southern Lacquer Co., Inc.

Paul M. Higinbotham, of Baltimore, Md., for Roessler & Hasslacher Chemical Co., Inc.

Cadwalader, Wickersham & Taft, of New York City, for Syrup Products Co., Inc.

Harry O. Levin and R. Palmer Ingram, both of Baltimore, Md., for Baltimore Paint & Color Works.

Squire, Sanders & Dempsey, of Cleveland, Ohio, for Glidden Co.

Tydings, Levy & Archer, of Baltimore, Md., for United States Industrial Alcohol Co. and United States Industrial Chem. Co.

Harry O. Levin and Jesse Fine, both of Baltimore, Md., for Louis B. Sless.

George R. Sommer, of Newark, N. J., for David B. Kaplus.

R. Palmer Ingram and Harry O. Levin, both of Baltimore, Md., for Samuel Albrecht.

George R. Sommer, of Newark, N. J., and R. Palmer Ingram, of Baltimore, Md., for Herman W. Lefkowitz, Kerney Vice, Mid West Chemical Co., Morris Kaplus, and Agricultural Chemical Works.

**WILLIAM C. COLEMAN,** District Judge.

The question here presented is as to the sufficiency of pleas in abatement and motions to quash three indictments, by which the defendants are charged with having conspired to violate the National Prohibition Act. Summarized, the grounds for these pleas and motions are: First, that unauthorized persons were present before the grand jury which found the indictments; and, second, that the

proceedings of the grand jury were not kept secret. In support of each of these grounds the defendants urge various contentions, which are hereinafter stated and separately considered.

The grand jury which returned these indictments was in session from the 5th of March until the 20th of July, 1931. The greater portion of its time was consumed in considering evidence which resulted in the bringing of the three indictments here in controversy, its term being extended by orders of court to enable it to complete its work. A great mass of testimony was presented.

■ Taking up the first contention, which relates to Mr. Coldiron, a Special Assistant to the Attorney General and one of the two persons whose presence before the grand jury is alleged to have been improper, his authorization is contained in the following appointment by the Attorney General:

"Department of Justice
"Washington, D. C.

"April 30th, 1931.
"Mr. John F. Coldiron,
"Special Assistant to the Attorney General,
"Department of Justice.
"Sir:
"You are hereby appointed a Special Assistant to the Attorney General, under the authority of the Department of Justice, to assist in the investigation and prosecution of the case of: United States vs. Amazon Industrial Chemical Corporation, Joe J. Darvin, Nate Scharlon, Jack Stein, Agricultural Chemical Works, Herman W. Lefkowitz, Southern Lacquer Company, Aaron A. Eisenberg, Ben Eisenberg, Ben Friedman, Sam Albrecht, Phellip Balsamo and others.

"In that connection you are hereby specifically authorized and directed to conduct in the District of Maryland or in any other judicial district where the jurisdiction thereof lies, any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys are authorized by law to conduct.

"You will receive no compensation other than the compensation you are now receiving as Special Assistant to the Attorney General, but subject to law and the regulations of the Department, you will be allowed your actual and necessary traveling expenses and $6.00 per diem in lieu of subsistence when away from your headquarters on official business.

"You should execute the required oath of office and forward the same to the office of the Appointment Clerk, Department of Justice.

"Respectfully,
"William D. Mitchell, Attorney General."

Defendants claim that this commission is defective in that it fails to refer, either specifically or generally, to alleged violations of any federal statute. We consider that this argument is too great a refinement and not to be supported. It is true that the nature of the investigation, and the statute alleged to have been violated, are not set out in the appointment; and it is further true that it is customary to describe such an appointment with more particularity than was done in the present case. However, failure to do so is not fatal, because a mere matter of form and not of substance. The authority for the Attorney General's appointment of Mr. Coldiron is embraced in the Act of June 30th 1906, 34 Stat. 816 (5 USCA § 310), which is as follows: "The Attorney General or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney General under any provision of law, may, when thereunto specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys may be by law authorized to conduct, whether or not he or they be residents of the district in which such proceeding is brought."

Whether there was authority prior to the passage of this act for the presence of any representative of the Department of Justice in the grand jury room, other than the United States attorney for the particular district, is a question which we need not here determine. See 5 USCA §§ 312 and 315. It appears that in order to set at rest any question as to the right of special assistants to appear, the Act of June 30, 1906, was passed; there having been a disagreement in the decisions as to the scope of the earlier statutes. See U. S. v. Rosenthal (C. C.) 121 F. 862; U. S. v. Cobban (C. C.) 127 F. 713; U. S. v. Twining (D. C.) 132 F. 129.

Numerous cases have been cited to the court from other districts from which it would appear that those districts have been inclined to insist upon a rather full and specific designation of the offense, and of the statute alleged to have been violated. But this is a procedural matter, largely within the discretion of the courts of the various circuits,

and, at most, the appointment now in controversy is merely a variance from an established practice of which a defendant himself has no right to complain. Even if the wrong statute is named in an indictment, the indictment may be good, provided the facts alleged therein constitute a crime. See Williams v. U. S., 168 U. S. 382, 18 S. Ct. 92, 42 L. Ed. 509. A fortiori, must the form of the present appointment be adequate.

■ The second point made against the validity of Mr. Coldiron's commission is that, while naming twelve defendants that were subsequently indicted in two of the indictments, it fails to name a number of other defendants embraced in the third indictment; and also that none of the twelve individuals and corporations so named in the commission and indicted in two of the indictments were associated, or indicted with those in the third indictment.

This contention we also find to be without merit for the reason that the commission, by the inclusion of the words "and others" after naming the twelve defendants, obviously contemplated an extensive investigation, which might embrace persons or corporations not at the moment sufficiently disclosed as to their activities to enable their being specifically named. Defendants argue that the inclusion of the phrase "and others" cannot be taken as a blanket catch-all; that its proper meaning is "others associated with them"; that it was never intended to mean "all others"; but that its general terms are limited by the specific names preceding it. In support of this contention, we are referred to such cases as Winder v. Caldwell, 14 How. 434, 14 L. Ed. 487. But in those cases statutes obviously requiring precise and narrow construction were involved—an entirely different question from that involved in the exercise of an undoubtedly very broad power on the part of the Attorney General to clothe his subordinates with authority to make any appropriate investigation or prosecution, having to do with any alleged offense under any laws of the United States. For decisions giving similar appointments a broad and sensible interpretation, see U. S. v. Martins (D. C.) 288 F. 991; U. S. v. Morse (D. C.) 292 F. 273; see also Horwitz v. U. S. (C. C. A.) 5 F.(2d) 129.

■ Finally with respect to the sufficiency of Mr. Coldiron's commission, it has been suggested, but not stressed, that the oath which he took, and which is as follows, was not in compliance with the Act of June 30, 1906:

"I, John F. Coldiron, do solemnly swear that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office of Special Assistant to the Attorney General of the United States on which I am about to enter: So help me God.

"John F. Coldiron

"Subscribed and sworn to before me this fourth day of May, A. D. 1931.

"Nellie E. Bishop

"[Notarial Seal.] Notary Public.

"Date of entry upon duty May 4, 1931.

"Residence, Washington, D. C."

We consider this suggestion entirely trivial. The oath is entirely sufficient as to form and substance. The fact that Mr. Coldiron took it in Washington, rather than the district of Maryland, is immaterial.

■ Coming now to the next contention, to the effect that the presence in the grand jury room of another person, Mr. Koontz, who took down all of the testimony in shorthand, was unauthorized, we find that he acted under the following appointment, also from the Attorney General:

"Department of Justice
"Washington, D. C.

"CEL April 23, 1931 CBS-bc
"23–35–163
"Mr. Edward L. Koontz,
"% United States Attorney,
"Baltimore, Maryland.
"Dear Sir:

"You are hereby appointed a Special Assistant to the United States Attorney for the District of Maryland, under the authority of the Department of Justice in the case of United States vs. Joseph J. Darvin, Nate Scharlin, Norman Paul, Southern Lacquer Company, Harry A. Isenberg, and others, involving an alleged conspiracy to violate the National Prohibition Act. In that connection you are hereby authorized and directed to conduct in the District of Maryland, or in any other judicial district where the jurisdiction thereof lies, any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which District Attorneys are authorized by law to conduct.

"Your compensation will be determined by the Attorney General upon the conclusion of your services and will be paid from the

appropriation for 'Pay of Special Assistant Attorneys, United States Courts.'

"Please execute and return the enclosed oath of office.

"Respectfully,

"William D. Mitchell

"ENCL.                    Attorney General."

The basis of this appointment is the same statute as that under which we have seen Mr. Coldiron was appointed, namely, the Act of June 30, 1906.

Defendants contend that Koontz's authority under this commission was limited to the conduct of legal proceedings, and that since he did not conduct any such proceedings, which is admitted, but acted solely as a stenographer, such action was unauthorized, first, because in contravention of the express language of his appointment; second, because there is no statutory authorization for the presence of stenographers in federal grand jury rooms; and, third, because at common law, stenographers are not, and have never been, legally authorized to be present at such proceedings.

With all three of these contentions we are in disagreement. As to the first one, since, admittedly, it was never intended that Mr. Koontz should be more than a stenographer, it would have been better to have so appointed him, because the accomplishment by indirection of what may be directly done in a matter of this kind, is not to be looked upon with favor. Nevertheless, such practice is not fatal under the circumstances. In fact, the precise procedure here adopted by the Attorney General was followed in previous instances and approved by the Circuit Courts of Appeals of other circuits, and, presumably, it was in reliance upon such decisions that the procedure in the present case was pursued. We see no reason to go contrary to those decisions. See Hale v. U. S., 25 F.(2d) 430, a decision of the Circuit Court of Appeals for the Eighth Circuit; Wilkes v. U. S., 291 F. 988, a decision of the Circuit Court of Appeals for the Sixth Circuit, certiorari denied 263 U. S. 719, 44 S. Ct. 181, 68 L. Ed. 523. See also U. S. v. Haskell, 169 F. 449, a decision of the District Court for the Eastern District of Oklahoma. It is true that there is authority to the contrary, and without attempting to determine whether or not the opposing authorities may be distinguished on their own facts, suffice it to say that we believe that the rule in the aforegoing cases represents the correct view. In the Wilkes Case, supra, the court said, page 993 of 291 F.: "Whether or not the appointment of the

stenographer as an assistant to the district attorney was necessary, it may have tended to emphasize his official character, and may well have been thought to give added assurance that the proprieties of the situation would be observed by him." In the Hale Case, supra, page 435 of 25 F.(2d), we find the following: "Counsel for plaintiff in error insist that the act of 1906 does not apply, because Bailey did not conduct proceedings before the grand jury, but merely took and transcribed the testimony. It is further urged that this practice operates to destroy the secrecy of proceedings before grand juries. It should be noted that the act of Congress applies to all who are authorized to conduct proceedings. A district attorney or an Assistant Attorney General may be present throughout an inquest without personal participation, but no one on that ground could challenge their right to be present, provided they did not participate in the deliberations of that body. We think also that the objection to taking down the testimony offered, the required secrecy being preserved in its proper intendment, is not well founded. We are aware that there is a conflict of decision upon this point, but we adhere to the rule announced in the following cases: Wilson v. United States (C. C. A. 2) 229 F. 344; Wilkes v. United States (C. C. A. 6) 291 F. 988, 992; May v. United States (C. C. A. 8) 236 F. 495. In Latham v. United States (C. C. A. 5) 226 F. 420, L. R. A. 1916D, 1118, which holds to the contrary, it will be observed that Lantz, who acted as stenographer, was a clerk in the office of the district attorney, was not a lawyer, had no authorization from the Attorney General, and merely had subscribed on oath to keep secret the proceedings of the grand jury. We do not think the rule announced in that case, upon the facts before that court, has application here in any event."

█ In view of the aforegoing, it is scarcely necessary to discuss in detail the two remaining arguments made against Mr. Koontz's appearance as a stenographer before the grand jury, namely: (1) That there is no statutory authorization for the presence of stenographers in federal grand jury rooms; and (2) that at common law stenographers are not, and never have been, legally authorized to be present at such proceedings.

To the objection that there is no federal statutory authority for the presence of stenographers before grand juries, it follows from what has just been said that this is a question of statutory construction. In some

districts it is held that their right to be present is embraced in the Act of June 30, 1906. Hale v. U. S., supra; U. S. v. Haskell, supra. In other districts it is held that this act has no relation to stenographers. Wilson v. U. S., supra; Wilkes v. U. S., supra; U. S. v. Rockefeller (D. C.) 221 F. 462. By inference, at least, these latter decisions support the view which we believe to be the correct one, that the right existed at common law. This, we think, necessarily follows from the very nature and object of a grand jury proceeding, when viewed in the light of modern conditions and the exigencies of any particular set of circumstances. The rule is properly expressed, albeit in a dictum, in U. S. v. Heinze (C. C.) 177 F. 770, at page 772, as follows: "It has never to my knowledge been denied or doubted that the rule of the common law is that a grand jury, while deliberating upon an indictment or presentment, shall listen to witnesses who give testimony, and to no one else except the authorized law officers of the crown or the commonwealth. The English practice of permitting the presence of the prosecutor in the grand jury room is an apparent, but not a real, exception, for it is still true that the majority of prosecutions in England are private; the expense thereof being borne by the complainant, and the crown taking no part therein unless and until authority therefor be granted by the proper departmental officer. So, too, the instances of bailiffs, clerks, and stenographers are not exceptions to this rule. These useful persons are necessary or convenient in the same way as is a piece of furniture, but if it were made to appear that such persons, having obtained audience of the grand jurors, under the excuse of their occupation, sought to influence the result of their deliberations or to participate therein, the rule would be infringed." There are numerous state decisions supporting this view. See State v. Brewster, 70 Vt. 341, 40 A. 1037, 42 L. R. A. 444, and cases cited; State v. Bates, 148 Ind. 610, 48 N. E. 2.

Defendants assert that the procedure here in controversy, and of which we approve, may validly be adopted only where one or more of the following circumstances exist: (1) Where it has been the long-established practice; (2) where the stenographer is a regular member of the district attorney's staff; or (3) where a state statute gives persuasive force to the desirability of making the federal practice conform thereto. The practice in the Second, Sixth and Eighth Circuits is cited as an anomaly because meeting these exceptional requirements. See U. S. v. Simmons (C. C.) 46 F. 65; U. S. v. Rockefeller, supra; Wilson v. U. S. (C. C. A.) 229 F. 344; U. S. v. Morse (D. C.) 292 F. 273; U. S. v. Garrson (D. C.) 291 F. 646; Wilkes v. U. S., supra; Hale v. U. S., supra.

The first two objections are squarely met by the Wilkes and Hale Cases, supra, decided in the Sixth and Eighth Circuits, respectively, where it was for the first time determined that stenographers who were totally disconnected with the district attorney's office had a right to be present in the grand jury room. That Mr. Koontz's authority was unauthorized because he was "a chance man," and not a regular member of the district attorney's staff, scarcely needs to be mentioned. There is no contention that his oath was not adequate. It was identical with Mr. Coldiron's, and was taken in Maryland, although not filed with the court papers. He was as a matter of fact a member of the local bar, and concededly eminently qualified, from long experience as official stenographer to the Supreme Bench of Baltimore, to carry out his allotted task before the grand jury. As to the third objection, it is true that the Baltimore City Charter contains carefully drawn provisions setting forth in particularity the conditions under which stenographers may be attached to city grand juries. But as was said in U. S. v. Simmons, supra (page 67 of 46 F.): "While a statute of the state does not control the practice of the courts of the United States in criminal cases, the existence of such a provision in the laws of the state clearly indicates that the presence of a stenographer before a grand jury is not inconsistent with a due administration of justice in criminal cases."

Shorthand writing is a relatively modern invention. The work of grand juries in recent times exceeds, both in character and complexity, anything ever contemplated by the legal procedure of two or three generations ago. Therefore, what was considered adequate in the past is no index of present needs. The grand jury is an entirely independent body. It is to be assumed that its independence can only be adequately asserted by keeping step with modern progress. It is just as idle to say that a grand jury may not need a stenographer, as it is to say that a trial court itself may not need one. To deny such assistance to the one is as unreasonable as to deny it to the other. The fact that stenographers have never before been used in grand jury proceedings in this district is of no force, because we are not now concerned with what has been done, but rather with

what may legally be done. The very fact that the proceedings here involved were perhaps the most extensive and embraced a larger volume of testimony than ever heretofore considered by any grand jury in this district, is in itself sufficient ground to establish the reasonableness of invoking this modern form of assistance in the jury's deliberations. Thus the .contention that the act of perpetuating the testimony in full was calculated to impress the grand jury with the idea that an indictment was expected to follow is specious. It is an unwarranted reflection upon the integrity of the grand jury. They were still free agents, free to weigh and to declare the weight of the testimony by their findings.

The correct rule is well stated in U. S. v. Rockefeller, supra, pages 466, 467, a decision (not appealed) of the District Court for the Southern District of New York, in which the following is said:

"It seems to me that, if the testimony given before the grand jury may not, under any circumstances or conditions, be made a matter of record and reference, we are opening the doors very wide, and inviting not only perjured and incompetent testimony, but even gossip and conjecture, before the grand jury. The proceedings there are not in strict accord with the proceedings in the trial of a case, and, if no safeguards are provided, many witnesses may be influenced or persuaded or induced to indulge in statements and accusations which ought not 'to be permitted or tolerated. * * *

"I would not think the question a particularly difficult or doubtful one, were it not for a very recent decision by an able and cautious District Judge of this circuit, presiding in another district. United States v. Rubin (D. C.) 218 F. 245. A careful examination of the opinion and decision in that case shows that the contention there made for sustaining the indictment was that the presence of the stenographer in the grand jury room was authorized by the 1906 act of Congress. In my judgment, the statute of 1906 has nothing to do with, and has no application to, the question presented by this plea."

■ We are referred to various reports in recent years of the Attorney General, showing that he has sought the passage of bills in Congress, providing for the presence of stenographers before grand juries. These measures have not been passed. But whether this proposed legislation was considered necessary, or merely desirable in the interest of uniformity, we need not attempt to determine.. Such legislation would successfully remove such divergence of opinion and practice as may exist on this point, but this lack of harmony does not persuade us to depart from the recognition of an inherent right, which has always existed in this district, although not heretofore exercised.

We now come to the second major contention made by defendants, which is that the proceedings of the grand jury were not kept secret. In support of this contention they rely upon the following facts respecting the method of transcription of stenographer Koontz's shorthand notes, taken in the grand jury room. After taking shorthand notes of all the testimony at each of the various sessions of the grand jury which he attended, Koontz carried the notes personally to his own office, where he conducts the business of court stenographer. This office he occupied jointly with one other stenographer. Pending transcription of his notes, which accumulated from day to day, he kept them, some in his own desk under lock and key, and others in a safe deposit box which he rented for that purpose. From time to time he took out various portions of his notes and translated them into a machine now in common use, known as the Ediphone, employing wax cylinders onto which the dictator talks through a tube, what he says being recorded on the wax cylinders by means of a needle; in other words, the well-known phonograph principle. The cylinders from this machine on which the testimony had been thus recorded were filed on racks in Koontz's office and taken, from time to time, by persons in his employment, to another office on a different floor in the same building, conducted by a group of public stenographers, where the cylinders were put on a second device known as the transcribing machine, and from that repeated to one of these public stenographers, who transcribed them into the typewritten pages. After each such transcription the cylinder records were shaved down, that is to say, the impression was destroyed so that no further transcription could be made, and the cylinders were thereby put in condition for use over again. The transcribed typewritten pages, when completed, were returned by messenger to Mr. Koontz's office, who directed any necessary corrections therein, which were made by the same stenographer who had transcribed them originally. The finished pages were then placed in a cabinet in the transcriber's office until delivered to the United States attorney's office. Neither this transcriber, nor any of the persons whom Koontz used to assist

him in transmitting the cylinders and the typewritten pages to and from his own office, were employees of the government, or had been required to take any oath respecting their duties so performed. An original and four carbon copies were made of some two hundred typewritten pages of the testimony; two copies were destroyed by Koontz personally, and the original and two other copies were delivered to the district attorney's office. Thereafter the original and only two copies were made, all of which were delivered to the district attorney's office. The transcript of the testimony was delivered periodically, a few hundred pages at a time. No appreciable amount of the transcription was made until after the grand jury had concluded its session.

Defendants contend that the aforegoing method adopted in the transcribing of the testimony taken before the grand jury, while admittedly in conformity with modern court practice, is, nevertheless, not permissible with respect to evidence produced before a grand jury, because of the greater secrecy which must surround all proceedings of that body, inherent in the very nature of its work. In short, defendants contend that the absence of what they assert to be requisite secrecy is a violation of their constitutional rights. However, defendants make no claim that by reason of the method of transcribing the testimony that was adopted, there have in fact been caused thereby any irregularities or improper practices working to their detriment. There is merely a bald assertion that such is likely to, and may have occurred in the present instance by reason of this alleged laxness in surrounding the transcription of the testimony with greater safeguards. They claim that, since it was a matter of common knowledge in Baltimore, announced through the public press, while this grand jury was in session, that it was investigating the activities of more than two hundred people, no one can say that there was not at least some one in this number unscrupulous and with a vital interest in ascertaining what was going on from day to day in the grand jury room, who would not have availed himself of improper methods to obtain information respecting these proceedings and who, having obtained such information, would not arrange to be called before the same grand jury to clear himself at the expense of an innocent defendant. It is not, however, asserted that there is any proof that any such thing did happen, but merely that the possibility that it might have happened requires the strictest rule of secrecy.

In order to ascertain whether there is any weight in this argument of the defendants, it is, of course, necessary at the outset to determine the reasons for and the extent to which secrecy must surround all matters connected with grand jury proceedings. The reasons which lie behind the requirement of secrecy may be summarized as follows: (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt. It is obvious that the basis of all but the last of these reasons for secrecy is protection of the grand jury itself, as the direct independent representative of the public as a whole, rather than of those brought before the grand jury. Of course, these latter are intended directly to share in the benefits from this rule of secrecy, but it is to be noted that none of the reasons for it are founded upon an inherent right in the individual who is being investigated to the same constitutional safeguards that are unquestionably his when he is brought to trial for a given crime. In other words, presentment or indictment for an offense are not to be confused with trial.

Defendants argue that the mere presence of an unauthorized person in the grand jury room is sufficient per se to quash an indictment, because (1) the opportunity for prejudice is presented, and (2) the difficulty of proving causation between such opportunity and actual prejudice that may have resulted; and they assert that these same reasons apply with equal force whether the opportunity arises from the presence of an unauthorized person in the grand jury room, or from the fact that the testimony may have been made available to outsiders. In short, they maintain that any distinction in the placing of the burden of proof in these two situations is without foundation.

It will be conceded that the presence of an unauthorized person before the grand jury, even though he may not have partici-

pated in any of its proceedings, is ground per se for abating the indictment without proof of actual prejudice. Certainly, this is established by the great weight of authority. See Latham v. U. S. (C. C. A.) 226 F. 420, L. R. A. 1916D, 1118, and cases cited. However, we do not agree with the assertion that the rule is necessarily the same when it comes to the question of the secrecy that shall surround the testimony presented to the grand jury. The reason for the rule with respect to the presence of unauthorized persons before the grand jury is deep seated in the traditions of the common law, and is based upon the very reasonable presumption that unless grand juries are kept free throughout their proceedings from personal contact with those who have no business before them, the chance for improper influences is not theoretical but real. Obviously the same rule does not apply, certainly with the same force, to mere opportunity being afforded for disclosure of what the grand jurors have themselves already taken under consideration. Witnesses before grand juries are not sworn to secrecy. If, then, from such witnesses complete disclosure is possible of all testimony given to a grand jury, what is the basis for prohibition against vicarious disclosures in the absence of proof of actual injury?

That the defendants, under conditions such as existed in the present case, cannot claim their rights have been violated in the absence of proof of some actual injury or tampering with the deliberations of the body which has indicted them, is supported by numerous analogies. For example, it has been held that the fact that during the investigation of a matter by a federal grand jury, in which an indictment was returned, the assistant district attorney, who was present in the grand jury room, made stenographic notes of the testimony taken, and afterwards, while the investigation was still in progress, read the same to the district attorney and also to a special agent, an attorney for the government, who was in consultation with him, and who later appeared as a witness before the grand jury, was not a violation of any legal rights of the accused, and did not constitute grounds for the abatement of the prosecution. U. S. v. American Tobacco Co. (D. C.) 177 F. 774. So also, in irregularities in the selection of grand jurors where there is no proof of their actual disqualification for prejudice towards defendant in any way, by the manner of their selection, the indictment will not be quashed. Moffatt v. U. S. (C. C. A.) 232 F. 522. Similarly, with respect to alleged improper action on the part of the district attorney in presenting evidence before the grand jury. U. S. v. Rintelen (D. C.) 235 F. 787. Indeed, the Supreme Court of the United States, many years ago, decided that, with respect to all such irregularities that do not prejudice the defendant, he has no cause of complaint and can take no exception. Agnew v. U. S., 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624.

But we need not rest the distinction here made merely upon analogy to such instances as above, because section 1025, Rev. St. (18 USCA § 556) declares that no indictment found and presented by any federal grand jury shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection, in matter of form only, which shall not tend to the prejudice of defendant, and this statute has repeatedly been construed to embrace irregularities in the entire procedure, as well as those with respect to the mere form of an indictment. U. S. v. Molloy (C. C.) 31 F. 19, 23; U. S. v. Cobban (C. C.) 127 F. 713, 715; Moffatt v. U. S., supra. As was said in the Cobban Case (pages 715, 716 of 127 F.): "In the interest of public justice this statute became imperative. Purely technical defenses, devoid of all merit, too often tipped the scales in favor of the lawless. Fortunately, this statute, as an armor to justice, directs that the existence of irregularity, if error of form, shall not be presumed a wrong to the accused; but it must be shown to be so. Among the authorities so holding are U. S. v. Ewan (C. C.) 40 F. 451, and Agnew v. U. S., 165 U. S. 44, 17 S. Ct. 238, 41 L. Ed. 624. The latter says: 'Another general rule is that for such irregularities as do not prejudice the defendant he has no cause of complaint, and can take no exceptions.' Of the irregularities alleged by these pleas, and which are subject to this rule, may be mentioned those as to impaneling the jury, the disqualification of jurors, the appearance before the jury and taking part in its proceedings of improper persons, and irregularities of procedure and conduct before the jury. If there were doubts whether this section includes irregularity in the entire procedure or only those of form in the indictment, the ruling of Mr. Justice Brewer, concurred in by Judge Thayer, in U. S. v. Molloy (C. C.) 31 F. [19], 23, disposes of them in favor of the first proposition."

The defendants rely primarily upon the case of U. S. v. Philadelphia, etc., R. Co., 221 F. 683, a decision rendered in 1915, by the District Court for the Eastern District of

Pennsylvania. It is true that in this case one of the points raised is that the testimony, after being taken down in the jury room by a stenographer, was transcribed by outsiders, and the court stated that this invaded the traditional secrecy of such proceedings. However, the primary ground upon which the court rests its decision is that the Act of June 30, 1906, did not authorize the appointment of an attorney who was not intended to conduct the proceedings, but whose sole duty was to report stenographically the testimony before the grand jury; that is to say, that since the statute defined who might be present and did not include stenographers, the latter could not be introduced into the grand jury room by indirection when they could not be introduced directly under the statute. The court thus impliedly, if not expressly, said that there is no authority either by statute or common law for the presence of stenographers. With this construction of the Act of June 30, 1906, we do not agree for the reasons heretofore fully given. Therefore, we are not inclined to follow the decision in this case.

As was said in State v. Brewster, supra, page 351 of 70 Vt., 40 A. 1037, 1040: "When it is considered that an indictment determines no more than that the respondent should be put upon trial, it is apparent that nothing but such an irregularity as is shown will and does prejudice the accused, should avail to abate the indictment. The court should not act upon a conjecture that it might have prejudiced him. It must be shown to have prejudiced, or be of such a character as would naturally prejudice, his rights. Certainly, no stricter rule should be applied in abating an indictment for such causes than is applied to set aside the verdict of a jury. The rule stated is the one this court has applied to setting aside verdicts of the jury. Briggs v. Georgia, 15 Vt. 61; Mann v. Fairlee, 44 Vt. 672; Quinn v. Halbert, 52 Vt. 353; Kelley v. Downing, 69 Vt. 266, 37 A. 968."

Laxity in the matter of transcribing or dealing in any other way with testimony taken before grand juries is, of course, to be avoided. All reasonable safeguards should be adopted to prevent any unauthorized disclosures. It may be conceded that a more personal control of the entire process of transcribing the testimony in the present case would have been the better and safer practice. But as has already been emphasized, defendants claim that, regardless of proof of prejudice or injury, the mere possibility of such disclosures impairs their constitutional rights, results from a confusion of the substantive rights to and during the trial with those in connection with presentment or indictment. The grand jury system dates back at least as early as the reign of Edward III; that is, to the Fourteenth Century. During the early centuries it was regarded as a security to the individual of his rights and preventing persecution in the name of the king. Thus, the Magna Charta forbade that felonies should be prosecuted in any other manner than by indictment or presentment, and a provision securing the right to an indictment by the grand jury in the case of felonies is part of the Federal Constitution (Amendment 5) and also of the Constitution of most of the states. The history of the origin and powers of the grand jury are well expressed by Mr. Justice Miller, quoting the language of Justice Field, in Ex parte Bain, 121 U. S. 1, 7 S. Ct. 781, 786, 30 L. Ed. 849, as follows:

"The importance of the part played by the grand jury in England cannot be better illustrated than by the language of Justice Field, in a charge to a grand jury, reported in [Charge to Grand Jury], 2 Sawy. 667 [Fed. Cas. No. 18255]:

" 'The institution of the grand jury,' he says, 'is of very ancient origin in the history of England,—it goes back many centuries. For a long period its powers were not clearly defined; and it would seem, from the accounts of commentators on the laws of that country, that it was at first a body which not only accused, but which also tried, public offenders. However this may have been in its origin, it was at the time of the settlement of this country an informing and accusing tribunal only, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial. And in the struggles which at times arose in England between the powers of the king and the rights of the subject, it often stood as a barrier against persecution in his name; until, at length, it came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the crown. In this country, from the popular character of our institutions, there has seldom been any contest between the government and the citizen which required the existence of the grand jury as a protection against oppressive action of the government. Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it

its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity. No person shall be required, according to the fundamental law of the country, except in the cases mentioned, to answer for any of the higher crimes unless this body, consisting of not less than sixteen nor more than twenty-three good and lawful men, selected from the body of the district, shall declare, upon careful deliberation, under the solemnity of an oath, that there is good reason for his accusation and trial.' "

In Ex parte Bain, there was a clear violation of rights because the indictment was changed by the prosecuting officer, and thereafter it was no longer the indictment of the grand jury which presented it. Obviously, any such change is a violation of substantive rights; but there is nothing in the doctrine of this or similar decisions of the Supreme Court which in any way indicates that those indicted may have the indictments quashed upon a mere showing that certain formalities, whether customary or not, have been dispensed with, unless actual prejudice is shown to have resulted therefrom. As already pointed out, it is significant in this connection to note that witnesses before federal grand juries are not sworn to secrecy. Also, there was just as great a possibility of departure from the rule of complete secrecy with respect to the testimony when lodged in the hands of the United States attorney's office, as there was with respect to the testimony when handled by the stenographer, Mr. Koontz. Yet we find no complaint with respect to the former. The United States attorney's office is even more public than was Mr. Koontz's office and the offices of those associated with him in the transcribing of the testimony, and there is nothing to indicate that any greater safeguards were adopted against access to the testimony in one place than in the other. Of course, laxity in the one place would not be an answer to laxity in the other. But the practice adopted in the United States attorney's office is equally not shown to have resulted in any violation of the rights of the accused. Indeed, it would appear to be the common practice in all jurisdictions where testimony before grand juries is transcribed.

For the aforegoing reasons, defendants' pleas in abatement and their motions to quash the indictments are overruled.