94 So.2d 25 (1957)
232 La. 184
STATE of Louisiana
v.
Sidney Paul REVERE.
No. 43077.
Supreme Court of Louisiana.
February 25, 1957.
*26 Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Leon D. Hubert, Jr., Dist. Atty., Phil Trice, Asst. Dist. Atty., New Orleans, for appellant.
Eugene Stanley, Clem H. Sehrt, New Orleans, for defendant-appellee.
FOURNET, Chief Justice.
The state is appealing from the judgment of the district court quashing an indictment returned by the Grand Jury for the Parish of Orleans charging the defendant, Sidney Paul Revere, with perjury as denounced by RS 14:123, on the ground that one Edward Stevens, an unauthorized person, had been present in the grand jury room during that body's investigation of the case against the accused.
According to the record it appears that the grand jury during the month of January 1953 had for investigation alleged irregularities in connection with the operation of the Louisiana State Museum under the directorship of the defendant, and, as a result thereof, that several indictments were returned against him on February 11, 1953, one being Indictment No. 141-214, which was allotted to Section "A" of the Criminal District Court for the Parish of Orleans and charged him with perjury.[1]
*27 It was during the trial of the defendant in Section "E" on one of the other indictments (No. 141-209)[2] that defense counsel first learned Edward M. Stevens had been present in the grand jury room as monitor of a machine being used to record the proceedings before the grand jury which resulted in the return of this indictment, and they, on June 6 following, filed a motion to quash the indictment in the instant case on that ground.
On trial of the motion Stevens, the only witness, testified that at the time the indictment was returned he was serving as an investigator in the office of the district attorney for the Parish of Orleans, to which office he had been assigned by the police department of the City of New Orleans in the fall of 1952, having served for some 5 years prior thereto as a desk sergeant for that department. He further testified he was called by the District Attorney to monitor the "Soundscriber" machine being used to record the testimony of the witnesses appearing before the grand jury in connection with the investigation of the Louisiana State Museum, and that after having been administered the oath of secrecy by the foreman of the grand jury, he did monitor the machine and later made a typed transcript of the proceedings from this recording. He stated that although he was a typist, he was unable to take shorthand, and, further, that prior to the investigation of the case by the grand jury he had participated in the investigation of the accused that finally resulted in the return of the indictment.
The rationale of the trial judge's reasons for his ruling in quashing the indictment may be succinctly stated to be that "The legislature has prescribed what persons may be permitted to attend the sessions of the grand jury," and although a stenographer is an authorized person, inasmuch as Sergeant Stevens is not a stenographer and was, during the session, listening to the machine and not to the witnesses themselves, he "could not have been sworn before the grand jury in this capacity," and, therefore, "was not one of the persons authorized by law to be present." He further states that "To deviate in any degree from rules of procedure laid down by the statute opens the door to the possibility of abuse and prejudice," since "The statute regulating grand jury proceedings and prescribing what persons shall attend its sessions is designed to insure that no undue influence is exerted on members of the grand jury to the prejudice of either the state or the defendant," and "The secrecy of the grand jury proceedings makes it impossible to inquire into or to determine in any case whether its members have been subjected to undue influence."
The state contends, however, (1) that "the presence of Stevens during the grand jury session was in the capacity of a stenographer as contemplated in RS 15:215,"[3] arguing that this section merely lists those given specific permission to be present without forbidding the presence of others, and (2) that even though he was not an authorized person this, in the absence of a showing of prejudice or injury, "is not *28 sufficient basis for vitiating the indictment" under the law generally prevailing in this country.
So far as we can determine, the exact issue presented for our determination under the first contention has never been squarely passed on by any court.[4] In order that it may be intelligently and properly considered for decision, therefore, we must first review the function of the grand jury against the contributing historical factors that have given added significance to that body as we know it in America in modern times.
We find that while the actual origin of the grand jury is veiled in obscurity and cannot be traced with exact certainty, since it arose silently and gradually out of the usages of a state of society that has forever passed away, there can be no doubt that it is of medieval origin and antedates by centuries the criminal and civil trial juries that eventually evolved from it. It is generally conceded by serious students that the usage of a jury in the royal courts for the purpose of discovering and presenting to the king persons suspected of serious crime has its inception in one main rootthe old Carlovingian inquisitio of Frankish origin that was adopted in Normandy by its kings and brought to England, being employed by William the Conqueror as early as 1066 for the purpose of having a designated number of men summoned by a public officer to discover and present certain facts in answer to inquiries addressed to them. This was the machinery used extensively by William in the compilation of his Domesday Book around 1081-85, which contained the results of his inquest or survey of the lands of England. Thus it was that when Henry II, as a part of his general reformation of the law, and motivated by a desire to increase the detection and trial of crimes in the kingdom, issued his Assize of Clarendon in 1166, the first statute to institute the accusatory procedure as we know it today, he drew not on Anglo-Saxon precedents but on this medieval Frankish legal custom of calling together a body of neighbors to give upon oath a true answer to some questions that had a century previously been employed by the Conqueror. The accusatory body thus formed closely resembled the modern grand jury in personnel, duties, and powers, its members being from the first neither exactly accusers nor exactly witnesses, but designed to give voice to common repute and report. See 2 Pollock & Maitland, History of the English Law, 639, 642; Kenny, Outlines of Criminal Law 487, Section 718; Vanderbilt, Judges and Jurors 52; Orfield, Criminal Procedure from Arrest to Appeal 135 193; 1 Stephen, A History of the Criminal Law of England 244, 253; Holdsworth, A History of the English Law, Vol. 1, pages 312-350; Vol. 2, pages 197, 198, 256, and 257; Vol. 3, pages 608 and 609; 28 C.J. 763, Section 4; 38 C.J.S., Grand Juries, § 1 c, p. 982; 24 Am.Jur. 833, Sec. 3; 12 RCL 1014, Sec. 2; 38 Journal of Criminal Law and Criminology 43; 10 Oregon Law Review 101; 16 Fordham Law Review 131; Charge to Grand Jury by Mr. Justice Field, U.S.C.C.A., Fed.Cas.No.18,255, 2 Sawy. 667; State ex rel. Porter v. District Court of First Judicial District, 124 Mont. 249, 220 P.2d 1035.
By a curious inversion this jury, established in order to make easy, and thus multiply, accusations of crime, became one of revising and, thereby, diminishing such accusations. It was deemed, in time, the very essence of an Englishman's liberty and his greatest protection against invasion of his life and liberty from unwarranted persons and motives; from unfounded *29 accusations and groundless prosecutions, whether engendered by partisan passions or private enmity; and from political persecutions and governmental tyranny in the centuries when absolute monarchs on the Continent did not hesitate to interfere with the subject's freedom by imprisoning him without accusation or hearing. So much was this true that it was one of those great and firmly entrenched rights whose preservation was wrung from the king to secure the subject against oppression and incorporated in the Magna Charta of 1215, and so sacred did it become to the Englishman that a mere attempt by the Crown to dictate to grand juries hastened the downfall of the Stuarts in 1688. Brought to this country by our forefathers, it was preserved in the charters of the original colonies and in our national Bill of Rights (Fifth Amendment to the Constitution) when this nation was founded, and, also, in many state constitutions, the Louisiana provision being Sections 2 and 9 of Article I of the Louisiana Constitution of 1921. And, lying, as it does, at the very foundation of our government, it is recognized today not only as an important tool in the enforcement of criminal law, but also as the last stronghold of the layman's initiative and shield in this field. Kenny, Outlines of Criminal Law 487; Vanderbilt, Judges and Jurors 52; 38 Journal of Criminal Law and Criminology 43; Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232, both the original opinion and the dissenting opinion of Mr. Justice Harlan; Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; In re Opinion to the Governor, 62 R.I. 200, 4 A.2d 487, 121 A.L.R. 806; Charge to Grand Jury, U.S. C.C.A., Fed.Cas.No. 18,255, 2 Sawy. 667; People v. Naughton, 7 Abb.Pr.,N.S., 421, 38 How.Pr.,N.Y., 430; Commonwealth v. Harris, 231 Mass. 584, 121 N.E. 409, 410.[5]
Not only has the grand jury been, traditionally, an inquisitorial body charged with determining whether probable grounds for suspicion of a crime exists, but, from its very beginning, its sessions have been surrounded by a cloak of seclusion and secrecy that has been jealously guarded and preserved during the intervening centuries as the only means of insuring that it be permitted the freedom of action necessary for a vigorous and effective discharge of its duties. The reasons underlying this necessity for secrecy are manyfold. Among them are: (1) It promotes freedom in the disclosure of crime; (2) prevents coercion of grand jurors through outside influence and intimidation and thus permits a freedom of deliberation and opinion otherwise impossible; (3) protects the safety and freedom of witnesses and permits the greatest possible latitude in their voluntary testimony; (4) prevents perjury by all persons appearing before the grand jury; (5) prevents the subornation of perjury by withholding facts that, if known, the accused or his confederates might attempt to disprove by *30 false evidence and testimony; (6) avoids the danger of the accused escaping and eluding arrest before the indictment can be returned; and (7) keeps the good names of the persons considered, but not indicted, from being besmirched. Thus it may be seen that the secrecy that has from time immemorial surrounded the grand jury sessions is not only for the protection of the jurors and the witnesses, but for the state, the accused, and, as has been said, for society as a whole. 8 Wigmore on Evidence, 2d Ed., 716, Sec. 2360, etc.; Greenleaf on Evidence, Sec. 252, etc.; 24 Am. Jur. 865, Sec. 47; 28 C.J. 763, Sec. 4, etc., 38 C.J.S., Grand Juries, § 1 c, p. 982; 10 Oregon Law Review 101-118; 1 Edward Livingston's Introductory Report to the Code of Criminal Procedure, Works Edition, 1872, page 370; Orfield, Criminal Procedure from Arrest to Appeal, 167-175; People v. Naughton, 7 Abb.Pr., N.S., 421, 38 How.Pr., N.Y., 430; In re Gardiner, 31 Misc. 364, 64 N.Y.S. 760; People v. Dunbar Contracting Co., 82 Misc. 174, 143 N.Y.S. 337; Ward Baking Co. v. Western Union Telegraph Co., 205 App.Div. 723, 200 N.Y.S. 865; In re Attorney General of United States, 160 Misc. 533, 291 N.Y.S. 5; Latham v. United States, 5 Cir., 226 F. 420, L.R.A.1916D, 1118; United States v. Amazon Industrial Chemical Corp., D.C., 55 F. 2d 254; Goodman v. United States, 9 Cir., 108 F.2d 516, 127 A.L.R. 265; In re Atwell, D.C., 140 F. 368; Commonwealth v. Mead, 12 Gray, Mass., 167; In re Opinion of Justices, 232 Mass. 601, 123 N.E. 100; State v. District Court of First Judicial District, 124 Mont. 249, 220 P.2d 1035; dissenting opinion in People v. Minet, 271 App.Div. 345, 66 N.Y.S.2d 391, which was upheld on appeal, see 296 N.Y. 315, 73 N.E.2d 529; State v. Watson, 34 La.Ann. 669; State v. Fox, 122 Ark. 197, 182 S.W. 906; Misso v. State, 61 Tex.Cr.R. 241, 135 S.W. 1173.
One of the earliest recorded oaths of jurors, in 1250, was to the effect that they pledged themselves "to conceal what they had heard," and this secrecy has come to be so much a matter of public policy in our day that it has been held: "It is manifest an examination of witnesses by the grand jury in the presence of others, witnesses, bystanders, or judges, necessarily and inevitably subjects the accused to a public trial without right to testify in his own behalf or to be represented by counsel or attorney. It is equally plain such procedure destroys the force and vital principle of the oath which enjoins the grand jury to keep secret `the commonwealth's counsel, your fellow's and your own.'" Commonwealth v. Harris, 231 Mass. 584, 121 N.E. 409. See, also, Orfield, Criminal Procedure from Arrest to Appeal 167; 10 Oregon Law Review 116.
At the very beginning the secrecy was so impregnable that no one other than witnesses for the prosecution were permitted to invade the jury room. All others were excluded, including the defendant, his witnesses and counsel, and even counsel for the crown, although the absence of the government's officer might result in the possibility that a bill would be ignored through some misapprehension of the law. Kenny's Outlines of Criminal Law 487, Section 718. Since that time, this secrecy has been invaded in only rare instances, and then either through legislative authorization or when it was deemed that the one admitted to the jury room was absolutely essential to the proper functioning of that body. The problem of relaxing the secrecy of the grand jury proceedings is incapable of rule-of-thumb solutions. A court faced with the question of determining whether to or not should recognize that if the secrecy requirement is regarded lightly it may foster the very practices which the grand jury functions to avoid, and, on the other hand, that if it is swept away entirely, the jury may feel hindered and tend to overcautiousness.[6] Conway v. Quinn, Mo. *31 App., 168 S.W.2d 445; In re Lebowitch, 235 Mass. 357, 126 N.E. 831; United States v. Heinze, C.C., 177 F. 770; Latham v. U. S., 5 Cir., 226 F. 420, L.R.A.1916D, 1118; Schmidt v. U. S., 6 Cir., 115 F.2d 394. See, also, 27 New York University Law Review 319-329.
The proper administration of justice requires impartial and unobstructed conduct at every phase of the criminal process, including the proceedings in the grand jury sessions. To risk having these proceedings divulged may not violate any specifically written constitutional right of the individual named, but it would most certainly violate every elementary rule of civil liberties and due process of law. The accused is not permitted to attend the sessions of the grand jury either with or without counsel, as a general rule, nor to know anything of the matters that occur there. Since he has no right in so far as that body is concerned except the right to have it duly impaneled and conducted according to law, his right in this respect should be rigorously protected.
In the light of the foregoing, it is obvious that if we are to preserve the traditional grand jury and its background in principle and theory we must answer the first contention posed adversely to the argument advanced by the state. Our statute (RS 15:215) not only makes it mandatory that the sessions of the grand jury be secret, but specifically enumerates the only persons authorized to appear before that body. A "monitor" or "operator" of a recording machine is not one of those enumerated, and we must conclude that until provision is made in our law for the presence of such persons, it is not the province of the court to hold they are included.
On the second point urged by the district attorney, i. e., that even though Stevens was an unauthorized person the indictment still cannot be quashed under the majority view prevailing in this country in the absence of a showing of prejudice or injury, we find a very extensive treatise on this subject in the annotation at 4 A.L.R.2d 392 entitled "Presence in grand jury room of person other than grand juror as affecting indictment," and in the discussion of the general rules and factors involved therein we find, at page 395, the following: "Although it appears well established that an indictment returned by a grand jury will be quashed or abated where the presence of an authorized person during the grand jury proceedings results in prejudice to the accused, there is a decided difference of opinion as to whether the mere presence of an unauthorized person, without a showing of prejudice, is a sufficient ground to set aside the indictment. The prevailing view, apart from statutes expressly affecting the question, is that the presence of an unauthorized person during the grand jury proceedings is, at most, a mere irregularity, not sufficient to constitute a ground for setting aside the indictment returned by the grand jury, unless prejudice to the accused is shown. * * * On the other hand, the view has been taken that the appearance of an unauthorized person before a grand jury is a sufficient ground for setting aside an indictment without a showing of prejudice to the accused." (Emphasis supplied.)
The majority view is based largely on the fact that judges are loathe and reluctant to delay justice and feel, further, that criminals should not be allowed to take advantage of a technicality in the law and thereby escape the consequences of their acts. But it would appear that this reluctance actually springs from the fact that the judge in the particular case could see no reason for invalidating an indictment
*32 for what was, in the mind of the court, a mere trivial irregularity.
However, an analysis of the cases sustaining the majority view discloses they are, for the most part, decided under certain broadly written statutes, or, in some instances, from jurisdictions having no statutory direction in the matter at all; further, that even in some of the jurisdictions lacking statutory provision, an indictment will be invalidated upon the mere proof that an intruder was present during any stage of the grand jury proceedings, the only persons not being considered as intruders being those that are inherently necessary, such as interpreters. In the jurisdictions having strictly drawn statutes, the presence of an unauthorized person at any time is considered fatal. An analysis will also disclose further distinguishing reasons for the holdings, such as, for example, that (1) in some cases where it is suggested from the language that the "prejudice test" was applied, reliance was actually placed on the fact that the particular individual objected to was a de facto member of some group of authorized persons, (2) that the court's refusal to set aside the indictment turned on the fact the motion was considered after the accused had been tried and convicted, the judicial sentiment here being that there existed little justification for then setting aside the violation, or (3) that the motion came too late after arraignment and plea to the indictment, which was considered in the nature of a waiver of any irregularities in the body returning it. See, annotation at 4 A.L.R.2d 392; 38 C.J.S., Grand Juries, § 40, etc., p. 1039; dissenting opinion of Judge Love in People v. Minet, 271 App. Div. 345, 66 N.Y.S.2d 391, at page 399, and the opinion upholding that view on appeal, at 296 N.Y. 315, 73 N.E.2d 529; In re Lebowitch, 235 Mass. 357, 126 N.E. 831; Latourette v. State, 91 Ark. 65, 120 S.W. 411; and the discussion and analysis of many of these cases and laws at 48 Columbia Law Review 682.
The minority view, on the other hand, is based on the concept that the setting of such a precedent imperils the very structure of the grand jury and would destroy the common law and statutory protection that has been placed around the secrecy of that body for centuries. For this reason, the jurisdictions adhering to the minority view tenaciously hold that the secrecy of the grand jury room is for the protection of complaining witnesses, the jurors themselves, those charged or accused, the state, and society as a whole.
The minority view finds much substance and merit when we consider that among the inalienable rights of our citizens in Louisiana is the one guaranteeing in our Bill of Rights that "No person shall be deprived of life, liberty or property, except by due process of law," and that "Prosecution shall be by indictment or information * * * provided, that no person shall be held to answer for capital crime unless on a presentment or indictment by a grand jury * * *" (Sections 2 and 9 of the First Article of the Constitution of 1921), and, further, the difficulty one encounters in attempting to show what transpired in the grand jury room because of the sanctity and secrecy that has been placed around that body, as well as the restrictions of law guaranteeing the seclusion of its proceedings. Our statutes demand that grand jurors, witnesses, and all authorized persons be administered the oath by which they swear to keep secret the proceedings of the grand jury and that secrecy cannot, thereafter, be invaded. RS 15:204, 212, 213, 215, 470, 471; State v. Jones, 8 Rob. 616; State v. Watson, 34 La.Ann. 669; State v. Lewis, 38 La.Ann. 680; State v. Britton, 131 La. 877, 60 So. 379; and State v. Taylor, 173 La. 1010, 139 So. 463.
The important point that is frequently overlooked in similar instances is that the mere presence of an unauthorized person in the grand jury room is violative of a substantial right of the citizen and cannot, if we are to preserve the safeguards of our heritage in grand jury proceedings, be abridged through the subterfuge of shifting *33 to that citizen the burden of proving such an invasion of his substantial right was prejudicial. "The contention," the highest court of Massachusetts points out, "that the burden is upon the defendant to show he was injured by action of the grand jury is unsound, because in the nature of things it would be impossible to prove the fact if true before the jury trial and because the wrong complained of is the violation of a substantial right guaranteed by the Bill of Rights, and is not a mere failure of the grand jury to observe technical requirements and formalities." Commonwealth v. Harris, 231 Mass. 584, 121 N.E. 409, 410. Or, as put by the United States Circuit Court of Appeal in Latham v. United States, 5 Cir., 226 F. 420, 424, L.R.A.1916D, 1118, "The right of the citizen to an investigation by a grand jury pursuant to the law of the land is invaded by the participation of an unauthorized person in such proceedings, be that participation great or small. It is not necessary that participation should be corrupt, or that unfair means were used. If the person participating was unauthorized, it was unlawful. And this would be an unlawful invasion of the right of the citizen, and unless this unlawful invasion is rectified by a proper tribunal at the instance of the citizen, it becomes a justified illegality; and, in the words of Judge Hough: `A justified illegality, however trivial of itself, is of the highest importance.'" And we think most appropriate here the observation in United States v. Rosenthal, C.C., 121 F. 862, 873, that "Every citizen is amenable to the secret inquisition of the grand jury, and he may demand justly that his essential rights be guarded by the wholesome preservation of settled systems and policies, that give greater certainty to legal proceedings * * *. The inconvenience of resubmitting the matter to the grand jury is temporary; the injustice of denying the defendants investigation pursuant to the law of the land would be perpetual." (Emphasis supplied.)
Another point frequently overlooked is that it is not the fact that prejudice actually resulted that is of primary and vital concern, but that an opportunity was made possible to exert prejudice and influence on members of the grand jury that must be guarded against. United States v. Edgerton, D.C., 80 F. 374; Latham v. U. S., 5 Cir., 226 F. 420, L.R.A.1916D, 1118; State v. Watson, 34 La.Ann. 669; Lewis v. Board of Commissioners, 74 N.C. 194; Commonwealth v. Harris, 235 Mass. 584, 121 N.E. 409.
The instant case furnishes its own best example. The record does not reveal whether Stevens appeared before the grand jury as a witness in this case, but he admitted he had taken an active part as a member of the police department assigned to the office of the district attorney in the investigation of the matter under consideration before the grand jury.[7] And while he denied he had in any way conducted himself in a manner that would have prejudiced the rights of the accused while in the grand jury room, the defendant has no way of contravening that statement under our statutory restrictions. In these circumstances we think most appropriate the following discussion by the highest court of New York in reversing a decision of the lower court in People v. Minet, supra [296 N.Y. 315, 73 N.E.2d 532], that had approved the presence in the jury room of the sister of the prosecuting witness in a rape case, who was nervous:
"Where the Legislature has wished to make prejudice a material determinant *34 it has so provided * * *. We should not write it into section 313. That is for the Legislature to do if it is to be done at all. It is true that in some jurisdictions it must be shown that the grand jury was influenced and the defendant prejudiced in his substantial rights before the indictment will be invalidated by reason of the presence of an unauthorized person. * * * We do not think that that distinction should be made under our statute. Except in the clearest situations it would be practically impossible to show influence or prejudice. Even an inspection of the minutes, which it is difficult for a defendant to obtain since it is granted only in order to enable him to move to set aside the indictment * * * would not show it in all probability. A change in expression, a pressure on the hand or a warning glance would not be shown upon the minutes but might well influence, suppress or alter testimony to the prejudice of the defendant. There may have been prior expressions or conversations between the two witnesses which the one then giving testimony might well hesitate to repudiate or modify in the presence of the other. The District Attorney here contends, and we are told that defendant's counsel conceded on the argument of the motion to dismiss, that defendant suffered no prejudice by the joint presence of the two sisters, but as was said in United States v. Edgerton, supra, D.C., 80 F. at page 375: `The court cannot know that this suggestion represents the fact.' We think the practice offers too great a possibility for the exercise of undue influence to be condoned. Approval of it would open the door to grave abuses and jeopardize safeguards with which the cumulative wisdom of our legislators, lawyers and judges has surrounded the institution of the grand jury. It is an institution which protects both the community and the individual. It is a serious matter for any individual to be charged with crime whether the charge be true or false. As was said in Matter of Gardiner, 31 Misc. 364, 375, 64 N.Y. S. 760, 767: `"It is as important to a person that he be fairly and justly accused of crime as that he be fairly and impartially tried therefor."'" (Emphasis supplied.)
We therefore conclude that the presence of Stevens in the grand jury room during the investigation of the defendant was not a mere irregularity, but a substantial violation of the defendant's rights, and that the trial judge, therefore, properly maintained the motion to quash.[8]
For the reasons assigned, the judgment is affirmed.
HAWTHORNE, J., absent.
HAMITER, J., concurs in the decree.
McCALEB, Justice (dissenting).
The majority opinion in this case is not only admittedly contrary to the prevailing view throughout this country on the question of the effect of the legality of grand jury proceedings when persons, other than the grand jurors, are present in the grand jury roomit is in discord with previous holdings of this Court, which are not mentioned in the opinion.
*35 For my part, I see no merit in the contention that, because Officer Stevens operated the "Soundscriber" machine, which recorded appellee's testimony before the grand jury, and later made a typed transcript of the testimony from this recording, he was an unauthorized person in the grand jury room within the meaning of the law or that his presence, if unauthorized, is a sufficient predicate for vitiating the indictment.
The two statutes pertinent to this case are R.S. 15:19 and 15:215. R.S. 15:19 forbids the presence of persons, other than members of the grand jury, during the deliberations of the grand jury on their findings. However, R.S. 15:215, after declaring that the sessions of the grand jury shall be secret, provides that the district attorney "shall have free access to said sessions; * * *" and "* * * may cause the testimony taken before the grand jury to be reported by a stenographer who must be first sworn by the foreman of the grand jury; * * *".
In my view, Stevens was nothing more nor less than a reporter of the grand jury proceedings and, as such, came within the purview of the statute. It is clear that the statute, while declaratory of secrecy in grand jury proceedings, specifically recognizes the necessity and desirability of an accurate report of such proceedings which remains available to the proper lawful enforcement officers and, to this end, it was provided that the testimony be reported by a stenographer, who shall be sworn to secrecy. But, in stating that the testimony should be reported by a stenographer, the Legislature was merely indicating the type of person who, during 1928 when the Code of Criminal Procedure was originally enacted, usually reported court proceedings. This provision is descriptive and it strikes me as unreasonable to conclude that the word "stenographer", as written in the Act, was intended to apply only to persons who write shorthand and that, if the person used to report the testimony did so in longhand or by stenotype or by recording machine, as in this case, the entire proceedings of the grand jury would be void.
R.S. 15:215 is declaratory of the preservation of secret sessions by the grand jury. Since Stevens was sworn to secrecy, there was no violation of the stated principle in this case. Nor is it shown that he did anything in the jury room other than act as reporter of the proceedings. In these circumstances, it appears to me that the ruling that Stevens' presence in the grand jury room was unauthorized and that the sessions of the grand jury are thereby void is founded on an interpretation of the statute, which is not warranted in the light of the purpose of its enactment.
This Court in the past has not regarded an irregularity in grand jury sessions, if the one at bar can be classed as an irregularity, to be destructive of the validity of the proceedings. On the contrary, in State v. Firmatura, 121 La. 676, 46 So. 691, where a motion to quash the indictment was predicated on the fact that a deputy sheriff named Tony Patillo, who acted as interpreter for the grand jury, was also a witness and had taken an active part in the investigation of the case, the court found that, since there was no evidence that the accused was in anywise prejudiced by any of the irregularities charged and since said interpreter did not participate or attempt to participate in the deliberations of the grand jury, the motion was without merit.
In State v. Louviere, 165 La. 718, 115 So. 914, which was also decided prior to the enactment of the Code of Criminal Procedure (from which R.S. 15:215 has been adopted), the motion to quash the indictment was based on the presence in the grand jury room of a stenographer who reported the testimony taken before the grand jury. The Court held that the motion was not well founded because the stenographer left the grand jury room *36 prior to the deliberations of the grand jury. In that case, the decision in State v. Watson, 34 La.Ann. 699 (which is cited in the majority opinion herein), was distinguished on the ground that, in the Watson case, an unauthorized clerk to the grand jury had access not only to the proceedings but to the deliberations of the grand jury. The Court said:
"We are of opinion that the mere presence in the grand jury room of a stenographer who confined himself to the taking down of the testimony of the witnesses in the presence of the grand jury and district attorney, and retired with the district attorney before the grand jury began its deliberations, was no more prejudicial to the accused than if the same testimony had been recorded on a phonograph or other mechanical device; and, surely, that would not prejudice the accused or suffice to vitiate the finding of the grand jury."
The foregoing quotation, in my opinion, fits this case and should control the decision.
I respectfully dissent.
NOTES
[1] The charge of perjury is in connection with a statement allegedly furnished the defendant by the Hotel Bentley of Alexandria, Louisiana, and is on two counts, the first being that he knew no such statement had been furnished and the second that he knew he had not paid the hotel attendant the sum of $34.06 in cash in settlement thereof, as sworn by him.
[2] This indictment charged the defendant with the theft of $177 in United States currency belonging to the museum. It resulted in a mistrial.
[3] RS 15:215 provides: "The sessions of the grand jury shall be secret, but the district attorney, as their legal adviser, shall have free access to said sessions; the district attorney may cause the testimony taken before the grand jury to be reported by a stenographer, who must be first sworn by the foreman of the grand jury; and whenever a witness is unable to speak the English language, the grand jury shall have the right, at its discretion, to employ an interpreter to translate the testimony of the witness, but such interpreter shall be first sworn to keep secret the proceedings of the grand jury."
[4] In the recent case of State v. Howard, 230 La. 327, 88 So.2d 387, there was no unauthorized person in the grand jury room, it being conceded the recording machine there used was operated by the district attorney. And, for the reasons hereinafter given in this opinion, the cases of State v. Louviere, 165 La. 718, 115 So. 914; and State v. Firmatura, 121 La. 676, 46 So. 691, will not be followed. Furthermore, the identical factual situation here presented was not there involved.
[5] In Commonwealth v. Harris the court very graphically expresses this thought thusly: "It was decided in Jones v. Robbins, 8 Gray, Mass., 329, that the clause in article 12 of the Bill of Rights of Massachusetts which reads: `No subject shall be arrested, imprisoned, * * * exiled, or deprived of his life, liberty or estate, but by the judgment of his peers, or the law of the land,' made an indictment or presentment of a grand jury essential to the validity of a conviction in cases of prosecution for felonies. In the opinion, delivered by Chief Justice Shaw, the court adopts the conclusion of Chancellor Kent that `the words by the law of the land, as used originally in Magna Charta in reference to this subject, are understood to mean due process of law, that is, by indictment or presentment of good and lawful men,' and goes on to declare that: "The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty.'"
[6] As has been very aptly said: "The inquisitorial power of the grand jury is the most valuable function which it possesses today, and, for more than any supposed protection which it gives to the accused, justifies its survival as an institution. As an engine of discovery against organized and far-reaching crime, it has no counterpart. Policy emphatically forbids that there should be any curtailment of it except in the clearest cases." In re Grand Jury Proceedings, D.C., 4 F.Supp. 283, 284.
[7] The senate of Massachusetts proposed legislation permitting the presence in the grand jury room of "a police officer or other person who has been engaged on the preparation of the case," and asked the court to rule on the constitutionality of such a provision. The court, in reply, said: "The attendance of a police officer would afford opportunity for subjecting witnesses to fear or intimidation, for preventing freedom of full disclosure by testimony, and for infringing the secrecy of the proceedings." In re Opinion of Justices, 232 Mass. 601, 123 N.E. 100.
[8] On this subject we think the following comment, made by Holdsworth, the most eminent of modern authorities on the history of the criminal law of England, in 1933 is most appropriate: "Ever since 1681, when the ignoramus of a grand jury saved Lord Shaftesbury from a trial for treason, it is clear that the grand jury is capable of being a real safeguard for the liberties of the subject. These liberties need safeguards even more today than they did in 1681 * * * because bureaucrats * * * have established a more effectual and more oppressive tyranny than the Stuarts ever succeeded in establishing. We cannot in these days afford to lose one of our few remaining securities for freedom of speech and action."