246 So.2d 814

**STATE of Louisiana**

**v.**

**H. Lane MITCHELL.**

**No. 50565.**

March 29, 1971.

Rehearing Denied May 3, 1971.

Booth, Lockard, Jack, Pleasant & Le-Sage, Whitfield, Jack, James E. Bolin, Jr., Shreveport, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Albert S. Lutz, Jr., Asst. Dist. Atty., for plaintiff-appellee.

HAMLIN, Justice:

Defendant, H. Lane Mitchell, a registered civil engineer and duly elected Commissioner of Public Works of the City of Shreveport from 1934 until December 31, 1968, when he retired from office because of alleged ill health, appeals from his convictions of the crime of theft, LSA–R.S. 14:67, under four indictments and his sentences to serve four years on each conviction in the Louisiana State Penitentiary, said sentences to run consecutively.

Some 234 bills of exceptions were reserved during the course of these proceedings, but in this Court counsel for the de-

fendant have assigned seven errors to the rulings of the trial court and have accumulated under each assignment the bills of exceptions applicable thereto. In order that the reader not be confused and so that this opinion will not bristle with numbers of bills of exceptions, we shall consider and dispose of each of the errors alleged by counsel for the defendant. We have read the record, consisting of thirty-one volumes, attached to and made part of the bills of exceptions, and we find that the errors assigned include all bills of exceptions.

As shown by the various pleadings and evidence, the State's position in these matters was that there was a common scheme and plan by and between defendant and his Garage Superintendent, Anthony J. Lucero, Jr., by which invoices representing fictitious purchases of different items by the City of Shreveport would be either fraudulently made or padded.

Defendant was jointly indicted with other persons, but on motion of the State for severance he was tried as a sole defendant.

We quote the following from the indictments filed against defendant and others, because said indictments charge the matters intended to be proved by the State:

INDICTMENT NO. 82,130

" * * * H. LANE MITCHELL and ANTHONY J. LUCERO, JR. committed the offense of THEFT as defined by R.S. 14:67 in that they

committed the theft of the following property and things of value:

cash money paid by the City of Shreveport for the purported purchase of materials and supplies but which was actually for the purchase and installation of a kitchen sink, dishwasher and cabinets installed in the home of H. Lane Mitchell for the personal use and benefit of the said H. Lane Mitchell, all of a total value of $640.60, the property of the City of Shreveport, Louisiana, more particularly, the said H. Lane Mitchell and Anthony J. Lucero, Jr., by means of fraudulent conduct, practices and representations, including the presenting of fraudulent and padded invoices, requisitions and purchase orders to the City of Shreveport for materials and supplies not delivered to and not received by the City of Shreveport, did take, misappropriate, and convert to their own use the above described property and things of value, which were the property of the said City of Shreveport and with the intention to deprive the said City of Shreveport permanently of said property and things of value, all without the consent of the said City of Shreveport to the said misappropriation and taking * * * "

INDICTMENT NO. 82,131

" * * * H. LANE MITCHELL, JOE WALBERG, and ANTHONY J. LUCERO, JR. committed the offense of THEFT as defined by R.S. 14:67 in that they

committed the theft of $18,000.00 in lawful United States money, the property of the City of Shreveport, Louisiana, more particularly the said H. Lane Mitchell, Joe Walberg, and Anthony J. Lucero, Jr., by means of fraudulent conduct, practices and representations, did take, misappropriate, and convert to their own use, the said sum of $18,000.00 from the proceeds of checks issued by the City of Shreveport to Joe Walberg, doing business under the name of Caddo Sales Company and Joe Walberg, Sales Agent, for motor vehicle tires and chemicals which were purportedly sold to the City of Shreveport by the said Joe Walberg but which were never delivered to and never received by the City of Shreveport, and all of said acts were done with the intention to deprive the said City of Shreveport permanently of said money, all without the consent of the said City of Shreveport to said misappropriation and taking * * *"

INDICTMENT NO. 82,132

" * * * H. LANE MITCHELL and ANTHONY J. LUCERO, JR. committed the offense of THEFT as defined by R.S. 14:67 in that they

committed the theft of $10,500.00 in lawful United States money, the property of the City of Shreveport, Louisiana, more particularly the said H. Lane Mitchell and Anthony J. Lucero, Jr., by means of fraudulent conduct, practices and representations, did take, misappropriate, and convert to their own use, the said sum of $10,500.00 from the proceeds of checks issued by the City of Shreveport to Caddo Sales Company, for motor vehicle tires which were purportedly sold to the City of Shreveport by the said Caddo Sales Company, but which were never delivered to and never received by the City of Shreveport, and all of said acts were done with the intention to deprive the said City of Shreveport permanently of said money, all without the consent of the said City of Shreveport to said misappropriation and taking * * *"

INDICTMENT NO. 82,133

" * * * H. LANE MITCHELL and ANTHONY J. LUCERO, JR. committed the offense of THEFT as defined by R.S. 14:67 in that they

committed the theft of $55,000.00 in lawful United States money, the property of the City of Shreveport, Louisi-

ana, more particularly the said H. Lane Mitchell and Anthony J. Lucero, Jr., by means of fraudulent conduct, practices and representations, did take, misappropriate, and convert to their own use, the said sum of $55,000.00 from the proceeds of checks issued by the City of Shreveport to Adair Tire Company for motor vehicle tires which were purportedly sold to the City of Shreveport by the said Adair Tire Company but which were never delivered to and never received by the City of Shreveport, and all of said acts were done with the intention to deprive the said City of Shreveport permanently of said money, all without the consent of the said City of Shreveport to said misappropriation and taking * * * "

The above indictments were filed on March 13, 1969;[1] defendant thereafter filed motions to quash all four indictments, motions for bills of particulars and for discovery, and motions for writs of subpoena duces tecum. These motions were overruled and will be discussed infra insofar as they pertain to the errors assigned.

A preliminary examination to take and perpetuate the testimony of Anthony J. Lucero, Jr., victim of a heart condition, was held during July, 1969. A closed hearing to perpetuate the testimony of Joe Walberg was held during September, 1969. The four cases were consolidated for trial, which commenced on October 20, 1969, and concluded on November 6, 1969. Sentences were pronounced thereafter, and the matters are now before us for our determination.

Specification of Error "A" recites:

"The trial court erred in denying defendant's motions to compel the District Attorney and others to produce statements by Tony Lucero, Nick Lucero, George T. Monsour and Joe Walberg and related data, and to answer certain related questions."

Anthony J. Lucero, Jr. gave a pre-trial deposition during July, 1969. Defense counsel avers that during the pre-trial deposition Lucero testified in considerable detail about having made the following three typed and signed statements:

"1. The first was sometime between December 1 and December 4, 1968. It was made in the office of Lucero's attorneys, Messrs. Ross and Barton. Lucero testified that he did not know what his attorneys did with the statement.

---

1. A fifth indictment charging theft was filed on the same day against H. Lane Mitchell and Anthony J. Lucero, Jr. Severance was granted the State as to Mitchell, and the case was consolidated for trial with the instant matters. Mitchell received a suspended sentence; hence, no appeal was taken.

"2. Tony Lucero's second statement was given in the middle of February, 1969, at a time when Tony Lucero was in P & S Hospital. It was about two pages long.

"3. Tony Lucero's third written statement was given on March 10 or 11, 1969, which was two or three days before Grand Jury returned the indictments in question on March 13, 1969. This statement was made at Lucero's home in the presence of his two attorneys, Messrs. Ross and Barton."

Defense counsel avers also that at the pre-trial deposition Lucero testified about the following pre-trial interviews:

"1. In November, 1968, he was interrogated at length by Investigators Roberts and Gibson. (In August-September, 1968, the City of Shreveport had employed and paid the CPA Firm of Heard, McElroy & Vestal, and Southern Research Company, Inc. to make an audit and investigation of suspected irregularities. Southern Research Company, Inc., is owned and operated by Mr. A. Harry Roberts. Mr. Gibson was one of his operatives.) They talked for about one hour. Both Mr. Roberts and Mr. Gibson *took notes*. Lucero testified that he told him all he knew at this time.

"2. On or about February 22, 1969, he was interrogated for about an hour by Mr. Roberts and his assistant, Mr. Gibbons. Tony Lucero, Mr. Roberts, Mr. Gibbons and Lucero's two attorneys, Messrs. Ross and Barton, were present.

"3. On or about March 13, 1969, the District Attorney visited Tony Lucero at the latter's home. The interview lasted about five minutes. Tony Lucero's lawyers were present. According to Tony Lucero at his pretrial deposition, the visit might be termed a 'social call.'

"4. On July 16, 1969, just before his extensive pretrial deposition, Tony Lucero was interviewed by the District Attorney in the District Attorney's office for about an hour. The District Attorney had Lucero's testimony already *typed up* 'in a book,' which the District Attorney read to Lucero, asking Lucero if that was going to be his testimony. Lucero would answer in the affirmative."

Nick Lucero, a State witness, gave statements to investigators and talked with the District Attorney prior to trial. On trial, he admitted that he had not always been truthful in his pre-trial statements.

George T. Monsour, a State witness, was interrogated by investigators and the Dis-

trict Attorney prior to trial. On trial, he admitted his involvement in the instant matters.

Joe Walberg was interrogated by investigators and the District Attorney prior to trial. He testified to these facts at his pre-trial deposition.

The making of the above pre-trial depositions and statements was admitted by the respective parties. At the pre-trial depositions, at the preliminary examination, and on trial, the above parties gave contradictory testimony. A witness would implicate another party at one hearing and would then not mention that person's name at another hearing. The parties would admit in one statement that they had been untruthful in prior statements. On trial, a certain amount of untruthfulness at pre-trial depositions was admitted by the above parties. They all admitted their participation with the defendant in the instant transactions, but they accused him of the theft charged.

■ Except for ordering the production of one statement made by Nick Lucero, the trial judge denied defense counsel's motions to have the District Attorney answer questions interrogating him as to whether he had the above pre-trial statements in his possession; he further denied defense counsel's motion to have produced instanter the above statements, transcriptions, and any notes, tapes, and records he might have in his possession. The trial judge also denied defense counsel's motion to have the witness Anthony J. Lucero, Jr. answer questions interrogating him as to whether an accountant had in his possession income tax returns of Lucero and his son Nick; he also refused to issue subpoenas duces tecum to the accountant to produce the Lucero income tax returns. Some of the motions were made in proceedings prior to trial, and some were made at trial; they are all connected with Specification of Error "A".

Defense counsel contend that in view of quoted and cited authorities, it is clear that the standard applied by the trial court concerning prior inconsistent statements simply does not comport with due process requirements of the Fourteenth Amendment.

The thrust of defense counsel's argument is that in order for them to prepare their defense and to effectively conduct it, the District Attorney should have revealed to them what statements he had of the four alleged accomplices.[2]

---

2. In brief, counsel for the defendant argue:
 "As has been previously discussed, Tony Lucero, Nick Lucero, George T. Monsour, and Joe Walberg were admitted thieves. They admitted being responsible for stealing thousands and thousands of dollars from the City of Shreveport. However, in these proceedings, they joined together in an effort to put the blame on the shoulders of a single man, The Honorable H. Lane Mitchell, defendant.
 " * * * *

The State contends that under the rules of "Discovery" and the facts and circumstances of this case, it was not compelled to reveal its evidence to defense counsel.

■ We agree with this contention of the State and find no merit in defense counsel's contentions with respect to the phase of Specification of Error "A", which we are now discussing. The instant trial was a lengthy one, and defense counsel exercised extensively their rights of examination and cross-examination. Defendant took the stand and testified in his own behalf. The record reflects that the jurors were fully apprised of all of the circumstances leading to the filing of the present indictments. The record also reflects that able counsel for the defendant presented their case well and suffered no prejudice

"And, of course, *not one* of this thieving foursome has been brought to the bar by the District Attorney for his part in the crimes at the time of Mr. Mitchell's trial.

" \* \* \*

" \* \* \* the state hoarded the statements from the witnesses. The *District Attorney* took the prerogative of deciding that *none* of the statements of the thieving four, save the innocuous one by Nick Lucero, should be turned over to defense counsel."

3. In State v. Hunter, 250 La. 295, 195 So. 2d 273 (1967), this Court stated:
 "Louisiana was in the vanguard of the states in granting a defendant the right to inspect his written confession before trial. \* \* \* However, we have steadfastly refused to broaden this holding into full pre-trial discovery of the varied items of evidence in criminal cases. \* .\* \*
 " \* \* \*

or deprivation by not being given the evidence they requested. We find that the evidence sought by defense counsel was evidence by which the State intended to prove its cases; defense counsel was therefore not entitled to pre-trial or trial inspection of the evidence they requested.

"The broad pre-trial discovery procedures of the Federal Rules have been adopted by most states. Stressing the fact that full pre-trial discovery was considered and rejected when the 1966 Louisiana Code of Criminal Procedure was drafted, the Louisiana Supreme Court in State v. Hunter [3] reaffirmed the prior Louisiana rule that a defendant is entitled to pre-trial inspection of his written confession, but refused to broaden the defendant's right to a full discovery of evidence in possession of

"The Louisiana State Law Institute, the official state law revision agency, considered this procedural area in its extensive studies leading to the Louisiana Code of Criminal Procedure, recently enacted as Act No. 310 of 1966. The Code embodies revised procedures designed to balance 'the interests of the individual and the state.' Yet, the Institute refrained from adopting pre-trial discovery for criminal cases. See, e. g., Art. 484, Comment (a), C.Cr.P. We also decline to do so. We hold the view that no more can be demanded of criminal procedure than that it be carefully designed to free the innocent and convict the guilty by fair trial within our constitutional framework." See, State v. Fox, 251 La. 464, 205 So.2d 42; State v. Pesson, 256 La. 201, 235 So.2d 568; State v. Cardinale, 251 La. 827, 206 So.2d 510; State v. Clack, 254 La. 61, 222 So.2d 857.

the district attorney. * * *" Pre-Trial Discovery, Dale E. Bennett, 29 La.L.Rev. p. 299. "The jurisprudence is well settled that the state is not required to permit the inspection of any of its evidence in a pending criminal prosecution, which would include police reports, the exception being a written confession of the accused, and at the time of the trial a defendant is not entitled to the production of a prior written statement of a witness unless the proper foundation has been laid for impeachment, the witness denying making the statement or defense counsel showing that the report indicates that one or more of the material statements therein are contrary to the sworn testimony." State v. Nails, 255 La. 1070, 234 So.2d 184 (1970). See, State v. Martin, 250 La. 705, 198 So. 2d 897; State v. Whitfield, 253 La. 679, 219 So.2d 493.[4]

The material fact to be proved by the State on trial of the instant four cases was the guilt of the defendant. The pre-trial statements of the witnesses contain some assertions contradictory to their testimony given on trial, supra, but the contradictory statements were not with respect to the material fact. At all times, before trial and during trial, the witnesses, as stated supra, asserted Mitchell's guilt of theft. Defense counsel conducted extensive cross-examination as to the credibility of the witnesses. Although it did not have the details, the jury was aware that pre-trial statements had been given and that depositions had been made. In its deliberations, the jury was therefore not deprived of any fact necessary for its determination of the guilt (of theft) or innocence of the accused.

State v. Weston, 232 La. 766, 95 So.2d 305, cited by counsel for the defendant, is

4. In Commonwealth v. Caplan, 411 Pa. 563, 192 A.2d 894 (1963), the Supreme Court of Pennsylvania pertinently stated:

"If we descend from ethereal theorism to the world of reality, we know that if Courts require the Commonwealth to inform each defendant of or permit him to examine its evidence, it will enable a person who commits a murder or a felony to invent, fabricate or manufacture his defense before trial—alibi 'blackout', insanity, self-defense, coercion, or perpetration of the crime by someone else—and determine whether he should take the witness stand or introduce any evidence and if so, what kind. As recently as 1955, this Court in Commonwealth v. Wable, 382 Pa. 80, 86, 114 A.2d 334, 338, speaking through Chief Justice Stern, said: ' "The general rule is that the accused has no right to the inspection of disclosure before trial of evidence in the possession of the prosecution": 2 Wharton's Criminal Evidence 1311, 1312, 1354 (citing cases from many jurisdictions).' At the very least, a defendant should be required to present exceptional circumstances and compelling reasons such as were present in DiJoseph's Petition, 394 Pa. 19, 145 A.2d 187, to justify an exception to the general rule. How otherwise can law abiding communities be adequately and justly protected against the appalling crime wave which is sweeping and alarming our Country. Defendants, District Attorneys and Courts should remember that Justice is not a one way street—Justice means fairness and protection for, and Justice to Society, as well as Justice for and the protection of the basic rights of an accused."

not apposite to the present matter. Therein, the prosecutrix admitted on trial that she had made a written statement to police officers immediately after the commission of the offense charged. When counsel for the defendant moved for the production of the statement, the District Attorney voluntarily offered to comply with counsel's request but only on condition that the statement first be read in its entirety to the jury. Defense counsel, not being apprised of what the statement contained, declined the District Attorney's conditional offer. The trial judge refused to order the production of the statement for inspection purposes, and this Court affirmed his ruling. We stated, " * * * Indeed, in making the request for production of the statement, counsel, as observed in State v. Simon, supra [131 La. 520, 59 So. 975, 976], ' * * * were merely on a fishing expedition' and the judge correctly denied the request."

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is likewise not apposite to the present matter. That case involved the suppression of an accomplice's confession in a murder case; the facts and issues are entirely different from those herein presented.

Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), is not apposite to the present matter. The defendants were charged with conspiring fraudulently to obtain the services of the National Labor Relations Board for their labor union by filing false non-Communist affidavits. The United States Supreme Court held that the trial court committed reversible error by denying a defense motion for the production of the grand jury testimony of certain government witnesses. The Court applied the federal rules which, as we have stated supra, have not been adopted by this State.[5]

■ The case of Jencks v. United States of America, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, led to the adoption of certain broad rules of discovery, supra, in federal cases. Louisiana, as stated supra, has not adopted such rules. Jencks,

---

5. In Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the United States Supreme Court stated:

"* * * In a variety of circumstances, the lower federal courts, too, have made grand jury testimony available to defendants.

"These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice.

This realization is reflected in the enactment of the so-called Jencks Act, 18 U.S.C. Sec. 3500 (1964 ed.), responding to this Court's decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which makes available to the defense a trial witness' pretrial statements insofar as they relate to his trial testimony. It is also reflected in the expanding body of materials, judicial and otherwise, favoring disclosure in criminal cases analogous to the civil practice."

a labor union officer, was indicted on a charge of falsely swearing that he was not a member of the Communist Party or affiliated with such party. The United States Supreme Court reversed his conviction, holding that he was entitled to inspection of reports made to the FBI by government witnesses as to events and activities to which they testified at trial. The United States Supreme Court has not ordered that due process of the Fourteenth Amendment extends to the States under the broad holding of Jencks; we are neither controlled by the case nor choose to follow its ruling.[6]

We do not find the case of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, apposite to this matter. Bruton involved a confession which is not the issue herein presented. Likewise, we do not find the case of Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed. 2d 9, apposite. Its decision rested on the general rule that the constitutional requirement of due process is not satisfied where a conviction was obtained by the presentation of testimony known to the prosecuting authorities to be false. Napue

v. People of the State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, is not apposite to this matter; it involved false testimony given at a murder trial. Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737, involved suppression of evidence and is not apposite to the present issue.

■ Under Specification of Error "A", defense counsel further contend that defendant was deprived of the right of confrontation. They argue that since the District Attorney refused at trial to affirm or deny the statements, etc., that he had on certain witnesses, defendant should have another chance, at retrial, to "effectively" cross-examine the witnesses involved under circumstances that do not "pose a substantial threat to his right to confront the witnesses against him."

We find no merit in counsel's contention. They had the opportunity to examine and cross-examine witnesses; they exercised this privilege. Defendant at no time was deprived of confrontation; he was represented by able counsel at all stages of these proceedings. The case of Powell

---

6. " * * * We hold that the petitioner was not required to lay a preliminary foundation of inconsistency, because a sufficient foundation was established by the testimony of Matusow and Ford that their reports were of the events and activities related in their testimony.

"The reliance of the Court of Appeals upon Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, is mis-

placed. It is true that one fact mentioned in this Court's opinion was that the witness admitted that the documents involved contradicted his testimony. However, to say that Gordon held a preliminary showing of inconsistency a prerequisite to an accused's right to the production for inspection of documents in the Government's possession, is to misinterpret the Court's opinion. * * * "

v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, is therefore not apposite; it concerned the right to be represented by counsel—not the right of counsel to inspect statements. The case of Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, is likewise not apposite; it involved the right to be represented by counsel and the right of cross-examination. Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934, involved confrontation, but the issue presented in that case is not the issue presented herein; defendant therein was deprived of his right to cross-examine an accomplice, and the United Supreme Court held that there was a denial of constitutional rights.

Under Specification of Error "A", defense counsel still further contend that: "* * * The Constitution guarantees defendant Mitchell the right to have his counsel prepared to the fullest for the 'inherently suspect', to use the words of the Bruton court, *quality* of testimony from such witnesses as the alleged accomplices in this case. Over and over, counsel for defendant sought such preparation through inspection of statements and related data of the key prosecution witnesses who had 'turned state's evidence'. Denying defense counsel this right made it impossible for him to adequately prepare for trial."

There is no merit in the above contention. As we have stated supra, defense counsel ably represented defendant; the record reflects that counsel was adequately prepared at all times during these proceedings.

We conclude that the allegations of Specification of Error "A" are without merit. Defendant suffered no violation of the Sixth Amendment to the United States Constitution as applied to the States under the Fourteenth Amendment; likewise, defendant was not deprived of due process under the Fourteenth Amendment to the United States Constitution.

As shown supra, defense counsel relies on many decisions of the United States Supreme Court, commencing with the celebrated case of Aaron Burr—not discussed herein because not apposite—United States v. Burr, 25 Fed.Cas. pp. 187, 191, No. 14,694 (C.C.Va. 1807). Many of the cases refer to circumstances where there was a deliberate deception or suppression; we do not find that such occurred in the instant case. The facts and circumstances, as shown supra, of the cited cases are not the same as are herein presented supra. In this prosecution, the jury heard the witnesses and the defendant. In addition to hearing the testimony of record, the jury heard argument as to the probability or improbability of the testimony; the jury was able to judge whether there were inconsistencies and contradictions to such an extent as to render the testimony unworthy

of belief to prove theft. After hearing the evidence and argument, the jury deliberated and rendered its verdicts. Hence, it appears that counsel for defendant were asking for total and complete discovery to which they were not entitled.

*Specification of Error "B" recites:*

"The trial court erred in denying defendant's motions to compel the District Attorney and others to produce copies of income tax returns and related data and to answer certain related questions."

Defense counsel complains of the following errors of law in this Specification:

"1. Due Process of Law. Federal Constitution, Amendment XIV; State Constitution, Art. I, Secs. 2 and 9.

"2. Subpoena Duces Tecum. Article 732 of the Louisiana Code of Criminal Procedure.[7]

"3. Right of Confrontation. Federal Constitution, Amendments VI and XIV; State Constitution, Art. I, Secs. 2 and 9."

We find no merit in Specification of Error "B". No error of law was committed by the trial judge in denying defense counsel's motions, supra, because as correctly contended by the State, "The real issue before the court and the jury was whether or not the defendant, H. Lane Mitchell, had participated in the thefts of the City of Shreveport by means of these false billings and padded invoices, and whether or not the money had reached him. Production or *inspection of income tax returns by any of these people* [Anthony J. Lucero, Jr., Nick Lucero, and Joe Walberg] *would not have shed any light on the issue as to whether or not the defendant Mitchell received the funds.* Certainly he could not be bound by what they placed on their income tax returns. Certainly that would not have been evidence as to whether he received the funds or not."

*Specification of Error "C" recites:*

"The trial court erred in denying defendant's pretrial motions to compel the District Attorney and others to produce certain documents, furnish the names and addresses of witnesses and certain other information and to answer certain questions."[8]

7. "A subpoena may order a person to produce at the trial or hearing, books, papers, documents, or any other tangible things in his possession or under his control, if a reasonably accurate description thereof is given; but the court shall vacate or modify the subpoena if it is unreasonable or oppressive." Art. 732, LSA–C.Cr.P.

8. Much emphasis has been placed upon this Specification of Error, and it will therefore be discussed in detail.

Prior to trial, defense counsel filed motions for Bills of Particulars and for Discovery. The motions averred that pretrial investigations were made by:

"a) Dwight E. Saur, Commissioner of Finance;

"b) George W. D'Artois, Commissioner of Public Safety, City of Shreveport;

"c) A. Harry Roberts and his Southern Research Company, Inc., employed for that purpose by the City;

"d) Ray Hanrahan, Court Reporter, who had taken shorthand statements;

"e) Heard, McElroy & Vestal, CPAs, employed by the City for that purpose;

"f) James M. Goslin, Jr., Sheriff, Caddo Parish;

"g) John A. Richardson, District Attorney, Caddo Parish; and

"h) others, to mover unknown."

The motions further averred that the District Attorney had in his possession information, statements, documents, photos, etc., obtained by the above investigators.

The motions also averred that the District Attorney had in his possession information, statements, documents, investigators' reports, etc., concerning the following persons:

"a) Tony Lucero, the alleged accomplice and star prosecution witness;

"b) Nick Lucero, Tony's son, who was another alleged accomplice and key prosecution witness;

"c) George Monsour, an alleged accomplice and key prosecution witness;

"d) Joe Walberg, an alleged accomplice and key prosecution witness;

"e) Anthony J. Lucero, son of Tony Lucero;

"f) William Lucero, brother of Tony Lucero;

"g) T. L. Bost, a mechanic under Tony Lucero;

"h) Earl R. Soap, a mechanic under Tony Lucero;

"i) Ashton Buis, a mechanic under Tony Lucero;

"j) Isaac Jacobs, who worked under Tony Lucero;

"k) Charlie Jones, who worked under Tony Lucero;

"l) Police Lt. Jim Lang; he did repair work on vehicles and bought and sold vehicles through Tony Lucero;

"m) Dwight E. Saur, the Commissioner of Public Finance, who initiated in-

vestigation for the City; he supervised the investigation; he selected and obtained City employment of investigators, A. Harry Roberts and his Southern Research Company, Inc.;

"n) Harry Roberts, who was employed by the City to make investigation;

"o) Southern Research Company, Inc., which was Roberts' company, employed by City to make investigation;

"p) Monsco Supply Company, Inc.;

"q) Robert L. Lindsey, CPA;

"r) T. W. Adair, the elder, and T. W. Adair, the younger; the elder owned and operated Adair Tire Co.; he died; the younger took over (Case No. 82,133);

"s) All suppliers to City and all persons who prepare invoices, etc.; and

"t) Each person interviewed by any investigator."

The motions called for the names and addresses of all persons interviewed, all persons the State expected to call as witnesses, and full names, etc., of all persons employed at the City Garage when run by Anthony J. Lucero, Jr. The motions called for the total number of separate transactions to be proved by the State and asked which documents and what witnesses would be offered to prove offenses to be designated. The motions called for all information helpful to the defendant within the scope of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The motions also called for subpoenas duces tecum.

The State answered the Motions for Bills of Particulars and filed oppositions to Motions for Discovery.[9] A lengthy

9. In No. 82,130, the State's answer to the Motion for Bill of Particulars and its opposition to the Motion for Discovery recites, in part:
"That during the entire period of time set forth in this indictment the defendant, H. Lane Mitchell, was the duly elected Commissioner of Public Works of the City of Shreveport, the defendant Anthony J. Lucero, Jr., was in charge of a garage operated by the Department of Public Works under the supervision of the defendants, H. Lane Mitchell and Anthony J. Lucero, Jr., and Monsco Supply Company, Inc., was a supplier who sold to the City of Shreveport through the Department of Public Works various materials and supplies for use by the Department of Public Works; That during

the month of August, 1968, H. Lane Mitchell and Anthony J. Lucero, Jr. went to the office of Monsco Supply Company, Inc., in Shreveport, Louisiana and placed an order with George Monsour, Vice-President of Monsco Supply Company, Inc. for the purchase and installation of a kitchen sink, dishwasher and cabinets to be installed at the home of H. Lane Mitchell, 350 Albany Street, Shreveport, Louisiana, for the personal use and benefit of H. Lane Mitchell; that the said H. Lane Mitchell and Anthony J. Lucero, Jr. instructed George Monsour to send invoices for this purchase and installation to the City of Shreveport but to list on the invoices other items purported to have been purchased by the City of Shreveport, that the above items named in the indict-

ment were delivered to and installed in defendant, Mitchell's, home; that as a result of a common scheme and plan carried out by George Monsour and these two defendants, the said George Monsour presented to the City of Shreveport, through the said Anthony J. Lucero, Jr., two invoices of the Monsco Supply Company, Inc. for copper pipe, copper unions and valves; that Anthony J. Lucero, Jr. signed the invoices thus affirming that the items thereon had been delivered; that subsequently purchase orders and requisitions (of the City of Shreveport) based upon the aforesaid invoices were processed through the office of H. Lane Mitchell and ultimately reached the Department of Finance of the City of Shreveport; that shortly after receiving the invoices the City of Shreveport issued checks to Monsco Supply Company, Inc. and in payment of statements rendered by the said supplier and based upon the invoices, purchase orders, and requisitions which had been furnished to the Department of Finance by Monsco Supply Company, Inc., Anthony J. Lucero, Jr. and H. Lane Mitchell; that at all times it was known to H. Lane Mitchell and Anthony J. Lucero, Jr. that the invoices were not correct and that the said merchandise and the installation thereof which was for the personal use and benefit of H. Lane Mitchell was being paid for by money from the City of Shreveport; that all of the aforesaid acts of fraudulent conduct, practices and representations occurred between the dates set forth in the Indictment and in Caddo Parish, Louisiana, and by means thereof, these two defendants did take, misappropriate, and convert to their own use and benefit the said sum of $640.60; and the State (through the Shreveport Department of Finance) has made available to the defendant, H. Lane Mitchell (for inspection and copying) all of the aforesaid invoices, purchase orders, requisitions and cancelled checks (including check voucher forms) of which the State has any knowledge.

"That, except as set forth hereinabove, everything else requested in this pleading consists of investigations, reports and other items of evidence which the State may or may not use as evidence upon the trial of this case and nothing else requested therein has anything to do with furnishing particulars to which the defendant in a criminal case would ever be entitled under the law of Louisiana."

In No. 82,131, the State's answer to the Motion for Bill of Particulars and its opposition to the Motion for Discovery recites, in part:

"That during the entire period of time set forth in this indictment the defendant, H. Lane Mitchell, was the duly elected Commissioner of Public Works of the City of Shreveport, the defendant Anthony J. Lucero, Jr., was in charge of a garage operated by the Department of Public Works under the supervision of the defendants, H. Lane Mitchell and Anthony J. Lucero, Jr., and the defendant, Joe Walberg, was a supplier who sold to the City of Shreveport through the Department of Public Works chemicals and tires for vehicles operated by the Department of Public Works; that as a result of a common scheme and plan carried out by these three named defendants, the said Joe Walberg presented to the said Anthony J. Lucero, Jr., invoices for tires and also invoices for chemicals; that Anthony J. Lucero, Jr., signed almost all of the invoices thus approving them for payment and thus affirming that the items thereon had been delivered; that subsequently purchase orders and requisitions (of the City of Shreveport), based upon the aforesaid invoices, were processed through the office of H. Lane Mitchell and ultimately reached the Department of Finance of the City of Shreveport; that shortly after the first of each month the City of Shreveport issued checks to Joe Walberg, Sales Agent, (individually, as 'Agent', as 'Caddo Sales Company'), and in payment of monthly statements rendered by the said supplier and based upon the invoices, purchase orders, and requisitions which had been furnished to the Department of

Finance by the said Joe Walberg, Anthony J. Lucero, Jr., and H. Lane Mitchell; that in a great many instances the invoices were 'padded', that is, the City of Shreveport was invoiced by Joe Walberg for more items of supplies and merchandise than he actually delivered; that each time after Joe Walberg received from the said Department of Finance a check covering items *not* delivered to the City of Shreveport, the said Walberg extracted therefrom the amount of money representing supplies and merchandise which *were* actually delivered by him to the City of Shreveport and he then delivered the remaining cash proceeds thereof to the said Lucero, who in turn delivered the said cash proceeds to H. Lane Mitchell; that at all times it was known to Walberg, Lucero and Mitchell that the invoices were not correct and at all times it was known to the said Walberg, Lucero and Mitchell that the cash sums of money delivered by Walberg to Lucero and by Lucero to H. Lane Mitchell came from the proceeds of checks issued by the City of Shreveport to the said Walberg (as aforesaid) and cashed by him for distribution to himself, to Lucero, and to the said Mitchell; that all of these aforesaid acts of fraudulent conduct, practices and representations occurred between the dates set forth in the Indictment and in Caddo Parish, Louisiana, and by means thereof, these three defendants did take, misappropriate, and convert to their own use the said sum of $18,000.00 in the manner set forth above, and that during said period of time a total sum in excess of $74,000.00 was paid by the City of Shreveport to Joe Walberg upon the said above described invoices, purchase orders, requisitions and checks, of which the said sum of $18,000.00 represents the amount of money paid out by the City of Shreveport in the above manner for tires and chemicals (including degreaser and degreaser compound) which were never delivered to and never received by the said City of Shreveport; the State is unable to set forth exactly which ones of the specific invoices were fraudulent and

padded but the State will prove upon the trial of this case that the aggregate sum of $18,000.00 represents the minimum amount of which the City of Shreveport was defrauded as aforesaid; and the State (through the Shreveport Department of Finance) has made available to the defendant, H. Lane Mitchell (for inspection and copying) all of the aforesaid invoices, purchase orders, requisitions and cancelled checks (including check voucher forms) of which the State has any knowledge."

In No. 82,132, the State's answer to the Motion for Bill of Particulars and its opposition to the Motion for Discovery recites, in part:

"That during the entire period of time set forth in this Indictment the defendant, H. Lane Mitchell, was the duly elected Commissioner of Public Works of the City of Shreveport, the defendant Anthony J. Lucero, Jr., was in charge of a garage operated by the Department of Public Works under the supervision of the defendants, H. Lane Mitchell and Anthony J. Lucero, Jr., and one Nick Lucero, d/b/a 'Caddo Sales Company' was supplier who sold to the City of Shreveport through the Department of Public Works, chemicals and tires for vehicles operated by the Department of Public Works; that as a result of a common scheme and plan carried out by these three named persons, the said Nick Lucero presented to the said Anthony J. Lucero, Jr., invoices for tires and also invoices for chemicals; that Anthony J. Lucero, Jr., signed and authorized other city employees to sign all of the invoices thus approving them for payment and thus affirming that the items thereon had been delivered; that subsequently purchase orders and requisitions (of the City of Shreveport) based upon the aforesaid invoices, were processed through the office of H. Lane Mitchell and ultimately reached the Department of Finance of the City of Shreveport; that shortly after the first of each month the City of Shreveport issued checks to 'Caddo Sales Company' in payment of monthly statements rendered by the said supplier and

based upon the invoices, purchase orders, and requisitions which had been furnished to the Department of Finance by the said Nick Lucero, Anthony J. Lucero, Jr., and H. Lane Mitchell; that in a great many instances the invoices were 'padded', that is, the City of Shreveport was invoiced by Nick Lucero for more items of supplies and merchandise than he actually delivered; that each time after Nick Lucero, d/b/a 'Caddo Sales Company', received from the said Department of Finance a check covering items *not* delivered to the City of Shreveport, the said Nick Lucero extracted therefrom the amount of money representing supplies and merchandise which *were* actually delivered by him to the City of Shreveport and he then delivered a part of the remaining cash proceeds thereof to the said Anthony J. Lucero, Jr., who in turn delivered the said part of the cash proceeds to H. Lane Mitchell; that at all times it was known to Nick Lucero, Anthony J. Lucero, Jr. and Mitchell that the invoices were not correct and at all times it was known to the said Nick Lucero, Anthony J. Lucero, Jr. and Mitchell that the cash sums of money delivered by Nick Lucero to Anthony J. Lucero, Jr. and by · Anthony J. Lucero, Jr. to H. Lane Mitchell came from the proceeds of checks issued by the City of Shreveport to the said Nick Lucero (as aforesaid) and cashed by him for distribution to himself, to Anthony J. Lucero, Jr. and to the said Mitchell; that all of these aforesaid acts of fraudulent conduct, practices and representations occurred between the dates set forth in the Indictment and in Caddo Parish, Louisiana, and by means thereof, these three persons did take, misappropriate, and convert to their own use the said sum of $10,500.00 in the manner set forth above, and that during said period of time a total sum in excess of $14,000.00 was paid by the City of Shreveport to 'Caddo Sales Company' upon the said above described invoices, purchase orders, requisitions and checks, of which the said sum of $10,500.00 represents the amount of money paid out by the City of Shreveport in the above manner for tires and chemicals which were never delivered to and never received by the said City of Shreveport; the State is unable to set forth exactly which ones of the specific invoices were fraudulent and padded but the State will prove upon the trial of this case that the aggregate sum of $10,500.00 represents the minimum amount of which the City of Shreveport was defrauded as aforesaid; and the State (through the Shreveport Department of Finance) has made available to the defendant, H. Lane Mitchell (for inspection and copying) all of the aforesaid invoices, purchase orders, requisitions and cancelled checks (including check voucher forms) of which the State has any knowledge."

In No. 82,133, the State's answer to the Motion for Bill of Particulars and its opposition to the Motion for Discovery recites, in part:

"That during the entire period of time set forth in this Indictment, the defendant, H. Lane Mitchell, was the duly elected Commissioner of Public Works of the City of Shreveport, the defendant, Anthony J. Lucero, Jr., was in charge of a garage operated by the Department of Public Works under the supervision of the defendants, H. Lane Mitchell and Anthony J. Lucero, Jr., and Adair Tire Company was a supplier who sold to the City of Shreveport through the Department of Public Works tires for vehicles operated by the Department of Public Works; that as a result of a common scheme and plan carried out by these defendants, the said Adair Tire Co. presented to the said Anthony J. Lucero, Jr., invoices for tires; that Anthony J. Lucero, Jr. signed and authorized other city employees to sign, all of the invoices thus approving them for payment and thus affirming that the items thereon had been delivered; that subsequently purchase orders and requisitions (of the City of Shreveport), based upon the aforesaid invoices, were processed through the office of H. Lane Mitchell and ultimately reached the Department of Finance of the City of Shreveport; that shortly

hearing was held on the motions; thereafter, the trial court denied all motions, stating that under the rules of discovery,

defense counsel were not entitled to have their motions maintained.[10]

after the first of each month the City of Shreveport issued checks to Adair Tire Company in payment of monthly statements rendered by the said supplier and based upon the invoices, purchase orders, and requisitions which had been furnished to the Department of Finance by the said Adair Tire Company, Anthony J. Lucero, Jr., and H. Lane Mitchell; that in a great many instances the invoices were 'padded', that is, the City of Shreveport was invoiced by Adair Tire Company for more items of supplies and merchandise than were actually delivered; that each time after Adair Tire Company received from the said Department of Finance a check covering items *not* delivered to the City of Shreveport, the said Adair Tire Company, through Mr. Adair, now deceased, (herein called 'the elder Adair') extracted therefrom the amount of money representing supplies and merchandise which *were* actually delivered by said Company to the City of Shreveport and he then delivered the remaining cash proceeds thereof to the said Lucero, who in turn delivered the said cash proceeds to H. Lane Mitchell; that at all times it was known to the said 'elder Adair', Lucero and Mitchell that the invoices were not correct and at all times it was known to the said 'elder Adair', Lucero and Mitchell that the cash sums of money delivered by the said 'elder Adair' to Lucero and by Lucero to H. Lane Mitchell came from the proceeds of checks issued by the City of Shreveport to the said Adair Tire Company (as aforesaid) and cashed by the 'elder Adair' for distribution to himself, to Lucero, and to the said Mitchell; that all of these aforesaid acts of fraudulent conduct, practices and representations occurred between the dates set forth in the Indictment and in Caddo Parish, Louisiana, and by means thereof, these defendants did take, misappropriate, and convert

to their own use the said sum of $55,000.00 in the manner set forth above, and that during said period of time a total sum in excess of $200,000.00 was paid by the City of Shreveport to Adair Tire Company upon the said above described invoices, purchase orders, requisitions and checks, of which the said sum of $55,000.00 represents the amount of money paid out by the City of Shreveport in the above manner for tires which were never delivered to and never received by the said City of Shreveport; the State is unable to set forth exactly which ones of the specific invoices were fraudulent and padded but the State will prove upon the trial of this case that the aggregate sum of $55,000.00 represents the minimum amount of which the City of Shreveport was defrauded as aforesaid; and the State (through the Shreveport Department of Finance) has made available to the defendant, H. Lane Mitchell, (for inspection and copying) all of the aforesaid invoices, purchase orders, requisitions and cancelled checks (including check voucher forms) of which the State has any knowledge."

10. Counsel for the defense asked the trial court, "Do I understand that the Court does deny each of the several motions in each of the cases styled, 'Motion for Bill of Particulars and for Discovery' and the supplemental motion by the same name?" The court responded, "That is correct." Counsel for the defense asked further, "Do I understand from the Court that it does deny and will not issue Writs of Subpoena Duces Tecum on each of the several motions therefor filed in each of the five cases?" The court responded, "That is correct. The Court feels that you have—what you are seeking here is to secure something that you cannot secure through discovery, and that this is a matter of circumventing the rules denying discovery in a criminal proceeding."

In this Court, defense counsel contend that by its rulings the trial court violated defendant's constitutional rights of due process and confrontation. They also contend that under LSA–C.Cr.P., Art. 732, they were entitled to the information they requested.

The State argues:

" * * * the motions for Bills of Particulars in these cases, besides being frankly applications for discovery, ask for the *names and addresses of all persons interviewed by anyone who made any investigation* concerning the matters at inquiry. Certainly that was a *'fishing expedition'*, to use the language of the court. Likewise in asking for sketches and drawings, as well as photographs, the defendant was simply making 'demands for nonessential details' and likewise asking for 'a recital of the details of the state's evidence.'

"While we agree that the matter is somewhat discretionary with the trial judge as the case of State v. Wright [254 La. 521, 225 So.2d 201] just stated, we feel that the state in the cases at bar gave a great deal of information and fully answered the motions for Bills of Particulars and even went the extra mile in some respects.

"Not only that but the state answered the motions for Bills of Particulars in such a way that the state would be re-

stricted in its proof and therefore was being fair and just in the answers which the state made. Likewise, in each of the state's answers the state set forth in particular detail the manner in which the falsifications and defrauding of the city's funds had been accomplished and by whom the scheme was carried out so as to be effective and so as to trace the stolen funds into the hands of the defendant Mitchell. The answers likewise set forth the specific range of the dates as shown in the indictments; they named names and described the system in detail.

"The state therefore submits that the information which was furnished fully showed what the state intended to prove in order that the accused could more properly defend himself. He was informed not only of the nature and the cause of the accusation against him, but how and with whom the state intended to show that this crime was committed by him in each of the indictments.

"At this point we feel that we have answered practically everything the de-defendant has complained of in the field of discovery generally, particularly with reference to all of the broad areas involved. * * *"

Argument with respect to Specification of Error "C" is lengthy and replete; but,

because of our finding infra, it is not necessary that we discuss all issues posed.

We find that the case of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, is not apposite to the present Specification of Error. Brady involved suppression of evidence;[11] no suppression of evidence has occurred in the instant prosecution.

We do not find that the trial judge's denial of defense counsel's motions was erroneous or an abuse of his discretion. It is the settled law of Louisiana, as set forth in the authorities discussed in Specification of Error "A", that an accused in a criminal case is without right to a pretrial inspection of the evidence upon which the prosecution relies for a conviction. The information requested herein by defense counsel was evidence upon which the State was relying for its proof of guilt. In the answers to the Motions for Bills

of Particulars (Footnote No. 9, supra), the State gave the defense all data needed by defense counsel for preparation of its cases. Defense counsel's motions requested intricate details to which they were not entitled. We do not find that Art. 732, LSA-C.Cr.P., supra, requires that a defendant be given the information herein sought; it contains the words, "A subpoena *may* order * * *" (Emphasis ours.) We find that the trial judge committed no reversible error, and that defendant's constitutional rights were not violated by his rulings. Specification of Error "C" is without merit.

*Specification of Error "D"* and *Specification of Error "G"* will be jointly discussed.

*Specification of Error "D"* recites:

"The trial court erred in denying defendant's motion to quash on the ground of improper selection of the venire."

---

11. We quote the following summary of Brady from 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215:

"After the petitioner had been convicted in a Maryland state court on a charge of murder in the first degree (committed in the course of a robbery) and had been sentenced to death, he learned of an extrajudicial confession of his accomplice, tried separately, admitting the actual homicide. This confession had been suppressed by the prosecution notwithstanding a request by the petitioner's counsel to allow him to examine the accomplice's extrajudicial statements. Upon appeal from the trial court's dismissal of his petition for postconviction relief, the Maryland Court of Appeals held that suppression of the evidence by the prosecution denied petitioner due process of law, and remanded the case for a retrial of the question of punishment only. (226 Md. 422, 174 A.2d 167.)

"On certiorari, the United States Supreme Court affirmed. In an opinion by DOUGLAS, J., expressing the views of six members of the Court, it was held that (1) the prosecution's suppression of the accomplice's confession violated the due process clause of the Fourteenth Amendment, but (2) neither that clause nor the equal protection clause of that amendment was violated by restricting the new trial to the question of punishment."

*Specification of Error "G"* recites:

"The trial court erred in denying defendant's motion to quash on the ground that an unauthorized person was present during the Grand Jury proceedings."

The Motion to Quash Indictment Because of Irregularities includes errors assigned in both Specification of Error "D" and Specification of Error "G". It recites:

"1.

"The manner of selecting the general venire list was illegal in that the Jury Commission did not select the prospective jurors in an impartial manner as required by Article 408 of the Code of Criminal Procedure.[12] The violation of Article 408 results from the following:

"(a) In using the Shreveport telephone directory to secure the names for the general venire list, the Commission excluded all qualified jurors residing

in Caddo Parish and outside of the City of Shreveport.

"(b) The system of rotating the selection of names from the telephone directory and the mailing lists prepared by Ark-La Gas Company and Southwestern Electric Power Company further discriminated against qualified jurors in the parish who are not utility customers, such as the occupants of hotels, rooming houses and the many residents of homes who are not carried in the utility billing lists or the Shreveport telephone directory.

"(c) The system used in selecting the general venire list from which the grand jury was drawn that returned the indictment against defendant is not an impartial method contemplated by the laws of the State of Louisiana, as shown by the recent change made by the Jury Commission to selecting names for the general venire list from the voter registration rolls.

12. "In parishes other than Orleans, the jury commission shall select impartially at least three hundred persons having the qualifications to serve as jurors, who shall constitute the general venire.

"A list of the persons so selected shall be prepared and certified by the clerk of court as the general venire list, and shall be kept as part of the records of the commission.

"The name and address of each person on the list shall be written on a separate slip of paper, with no designation as to race or color, which shall be placed in a box labeled 'General Venire Box.'

"After the jury commission has selected the general venire, it shall lock and seal the general venire box and deliver it to the clerk of court, as the custodian thereof.

"The jury commission shall meet at least once every six months and when ordered by the court, and may meet at any time to select or supplement the general venire. The commission may select a new general venire at any meeting, and shall do so when ordered by the court." LSA–C.Cr.P. Art. 408.

"2.

"The court reporter who transcribed the testimony before the grand jury which returned this indictment was not administered an oath by the court as required by Article 441 of the Code of Criminal Procedure to faithfully perform her duty and to keep secret the grand jury proceedings. The presence of an unsworn and therefore unauthorized person while the grand jury was examining witnesses in connection with the charges against defendant was in direct violation of Article 433 of the Code of Criminal Procedure.

"3.

"Defendant shows that the acts hereinabove complained of violate his constitutional right to due process and particularly violate the constitutional rights granted to him under Section 2 of Article II of the Constitution of the State of Louisiana and the 5th, 6th and 14th Amendments of the Constitution of the United States.

"WHEREFORE, defendant prays that this motion to quash be sustained and the proceedings instituted herein be dismissed."

Defense counsel contend that the Jury Commission herein involved did not, pursuant to Article 406 of the Code of Criminal Procedure, issue subpoenas or produce evidence relative to the qualifications of respective jurors. They further contend that

the method and results of the drawing of jurors violated defendant's right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

We find no merit in Specification of Error "D"; the record reflects that the trial judge correctly answered the contentions of defense counsel as follows:

"Now, the second point that was raised insofar as the motion to quash was concerned dealt with the selection of the members of the grand jury. Counsel has raised the point that the members of the grand jury in their selection that the commission shall select impartially at least three hundred persons having the qualifications to serve as jurors. I think the evidence showed here that the jury commission went in excess of that and actually selected a total of five hundred persons that were placed in the general venire box for the purpose of being drawn for the grand jury.

"The law provides certain qualifications for the jurors. I don't know of any system that the Court has or that the jury commission has that would tell them without personal contact with every juror that was picked whether or not that person would be qualified to read, write or speak the English language. He would have to have personal contact with every person, and I do not be-

lieve that is a practical solution to the selection of the jury. I don't think we could ever get one selected if the jury commission was required to go to the extent of having to determine before they could put anybody in the box whether that person could read and write the English language. I don't believe that is what the law intends. I think that the purpose for that law was that when the people are brought here that then the Court will investigate and no one will be permitted to sit on the jury if they cannot read, write or speak the English language. I think that at the time the people are brought in, if enough are brought in, the Court can then exclude those who are not eligible under these terms. I don't believe that the law actually contemplates that before a person could be placed on there that the burden should be on the jury commission to just go out and personally contact each individual. And I think that is the argument that counsel is making here, that they can't be placed in there unless they can read and write. And I don't believe that is what the law intends. I think that the law intends that the jury commission will make every effort to make an impartial selection of members to serve in the jury panel, and that in doing so that they will make every effort to produce a cross section of the community, but, that in doing so that

they do not have to adopt any particular type or method, that they can use different types and change from time to time. But the main criteria is that they not make any systematic exclusion of any person because of their race, their creed, their social or economic group, and also from a geographical standpoint. But, no one of those has any more weight than any of the rest. And I think all of them have to be taken into consideration when the jury commission makes the selection. I think that the strongest point that was raised here in regard to the selection of the jury was the question of whether or not there was a balance between the urban and the rural members of the venire.

"I think that the testimony that was before the Court indicated that of the forty people that were selected six were from outside of the City of Shreveport. I think that in so showing that that is indicative that at least six of these forty were not from what we would term the urban area, and that the evidence further indicated that approximately twenty-three to twenty-four per cent of the population was outside of the urban area. A quick mathematical figure there would show it to be an absolute that would possibly be eight or nine jurors that to have an exact balance between the two would have to be selected. I think that the selection of six is cer-

tainly a reasonable figure and shows that there has been no discrimination here insofar as the urban and the rural jurors are concerned.

"I think that the burden of proving that there has been some systematic exclusion of jurors—the burden is on the defense. And the Court does not feel that the burden has been sustained. For that reason, I will overrule the motion to quash."

The record reflects that on December 14, 1967, Mrs. Opal C. Goodgion was appointed Official Court Reporter for Division "D" of the First Judicial District Court in and for the Parish of Caddo, which appointment was signed by five judges; the appointment was effective January 1, 1968, and Mrs. Goodgion took her official oath of office on December 15, 1967.

J. P. McCullough, Foreman of the Grand Jury which returned the instant indictments, administered the oath of Grand Jury secrecy to Mrs. Goodgion when she was called into the Grand Jury room to report the proceedings of the Grand Jury in its deliberations of the charges filed against defendant.

■ Defense counsel contend that Mrs. Goodgion was an unauthorized person present during the Grand Jury deliberations because the mandatory provisions of Article 441 of the Code of Criminal Procedure, which recite, "Before being permitted to function in their respective capacities, the court shall administer an oath, to persons employed to record and transcribe the testimony and proceedings, and to interpreters, to faithfully perform their duties and keep secret the grand jury proceedings," were not followed. Counsel argue that the oath of secrecy should have been administered by the court and not by the Grand Jury Foreman.

We find no merit in Specification of Error "G" and find that the trial judge correctly answered the contention of defense counsel as follows:

"The basis for this is the fact that testimony before the grand jury was taken by an official court reporter of this Court, that the oath to this reporter was not administered by a judge, but, rather, by the foreman of the jury. The reading of the Act, it seems that the law says that the oath will be administered by the Court. It does not say 'judge'. It says 'Court'. As I say, it is an interpretation of whether or not the strict compliance as set forth in the Revere case [[State v. Revere] 232 La. 184, 94 So.2d 25] would apply to the case at bar. In the Revere case we had a situation that involved an investigator from the district attorney's office that was also a policeman who was also familiar with the operation of soundscriber machines, and at the time of the grand jury

proceeding he was brought into the grand jury room. He was never sworn by anyone, according to the testimony at the case. He was merely a person to monitor the machine, to keep it operating. He actually had no official status as a court reporter or anything else. He was just a person there to monitor the machine.

"The second distinction between that and the present case is the fact that that man also testified that he had actively participated in the investigation of this Revere case prior to the time that the grand jury heard the indictment. He was not a person authorized by the law to be present at that time. He was a person who the law specifically says was an unauthorized person. He was not a person that was sworn in any capacity to adhere to the confidential nature of the grand jury proceeding. I think that the Revere case is not controlling in the case at bar.

"I think that the case at bar that we have a situation where an official court reporter of this Court was brought to the grand jury proceedings. The grand jury foreman executed an oath which

he testified that he did, swearing her to secrecy. She then took the testimony of—I don't believe he said whether it was the whole proceeding or whether it was just part of it. It was never brought out, really. But she did take some of the testimony. There is no question of that that she was there and she did take some of the testimony, but it was all subsequent to the time that she was administered the oath by the foreman of the grand jury.

"Now, prior to the adoption of the new Code of Criminal Procedure there was no question that the foreman swore all the witnesses and also any other person that came into the proceedings such as an interpreter or the court reporter. The law was clear at that time that the person that did it was the foreman of the grand jury. He did all of it.[13]

"The only question now is whether or not this word 'Court' has changed that. I think that under the broad interpretation of the Court that the foreman of the grand jury is acting on the instruction of the Court. He is actually performing a function of the Court. And when he swears a witness in he is acting

---

13. Former LSA–R.S. 15:215 provided: "The sessions of the grand jury shall be secret, but the district attorney, as their legal adviser, shall have free access to said sessions; the district attorney may cause the testimony taken before the grand jury to be reported by a stenographer, who must be first sworn by the foreman of the grand jury; and whenever a witness is unable to speak the English language, the grand jury shall have the right, at its discretion, to employ an interpreter to translate the testimony of the witness, but such interpreter shall be first sworn to keep secret the proceedings of the grand jury."

under the authority vested in him by his position as foreman of the jury. And by virtue of that I feel that this person was properly sworn, and that for that reason the Revere case would not be controlling. And the motion to quash on the grounds of unauthorized person should be overruled."

The trial judge did not abuse his discretion in overruling the Motion to Quash.[14] The attached testimony reflects that under the facts and circumstances herein presented, defendant suffered no prejudice and experienced no violation of his constitutional rights, and no reversible error was committed.

*Specification of Error "E"* recites:

"The trial court erred in refusing to give defendant's special jury charges Nos. 15 and 16."

The entire specially requested Charge No. 15 recites:

"When a witness who is admittedly guilty and has confessed to his *own* guilt is produced by the State in an attempt to prove that the *defendant* is guilty and where such witness then proceeds to testify against the defendant he does what in popular language is called 'turning state's evidence.'

"By his own testimony he is what we call an accomplice. And I charge you that the testimony of an accomplice, testifying on behalf of the prosecution against the defendant, should be received by you with suspicion, and with the very greatest care and caution, and ought not to be passed upon by you under the same rules governing other and apparently credible witnesses.

"If you find that any time *before he is sentenced* any such witness made statements or gave testimony in which he *implicated the defendant on trial,* then you should take into consideration whether such statements or testimony implicating the defendant on trial were made in the *hope of leniency,* for himself or any member of his family, as a reward for implicating the defendant on trial.

"And, in determining what weight, if any, to give to the testimony of such a witness, you should take into consideration whether he decided to testify, or give a statement, with the *hope,* for himself or any member of his family, or thereby avoiding prosecution altogether, or of obtaining a lighter sentence or a suspended sentence, or early parole, or any other form of leniency.

14. Reason dictates that a Grand Jury should not be compelled to sit idly by to await the return of a temporarily absent judge to the courthouse to swear the official reporter or reporters who may be necessary to insure the continuing and efficient functioning of the Grand Jury in its investigations.

"The *hope* of obtaining leniency, even if there was *no promise* of leniency, can be concluded by you as a *sufficient reason* for a guilty witness to give statements against or to testify implicating the defendant on trial.

"And it would make no difference whether such *hope* of leniency was well founded or not."

██ The trial judge refused to give to the jury the last two paragraphs of Special Charge No. 15, supra; he also refused to give Special Charge No. 16, infra.

Specially requested Charge No. 16 recites:

"In considering what weight, if any, you will give to the testimony of a witness who is himself admittedly guilty, you should take into consideration whether, when he *first* made a statement tending to implicate the defendant on trial such witness had a *hope* of *leniency* as a reward for implicating the defendants on trial. And, it makes no difference whether such *hope* was well founded or not.

"In weighing the testimony of such a witness you may take into consideration whether he gave a statement or testified with the *hope* of thereby escaping prosecution altogether or of obtaining a lighter sentence or early parole or any other form of leniency."

Defense counsel contend that their most crucial defense was the foul quality of the testimony against defendant. They argue that the State relied almost exclusively upon the testimony of the two Luceros, Joe Walberg, and George Monsour, admitted thieves, and that they have never been arraigned, turning against "the big one," they said that he got all—they, little or nothing. Counsel submit that the terse and limited instructions by the court on credibility and impeachment were insufficient, and that the trial court fatally erred by failing to give defendant's Special Jury Charge No. 15 in its entirety.[15]

The State's witnesses were not confined to defendant's alleged accomplices. The deleted parts of Charge No. 15, and the complete Charge No. 16, had they been given by the trial judge to the jury, would have required qualification, limitation, or explanation. The trial judge was therefore under no duty to acquiesce in the demands of defense counsel. LSA–C.Cr. P., Art. 807.

The general charge of the trial judge contains lengthy instructions with respect to good character and reputation. It also informs the jury in detail as to credibility. The trial judge instructed the jury that

15. In this Court, defense counsel place no emphasis upon the trial court's refusal to give Special Jury Charge No. 16.

485
486

there were several lesser included offenses a verdict of which would be responsive to the charge of theft—attempted theft, unauthorized use of movables, etc.

A careful reading and analysis of the deleted parts of Special Charge No. 15 and complete Charge No. 16, refused by the trial judge, constrains us to find that the requested instructions to the jury go too far afield in a case of this nature; they appear to be argumentative. Defense counsel have cited no authority for identical charges. Defense counsel were able, intelligent, thorough, and industrious; in discussing the evidence adduced on direct and cross-examination, they no doubt argued to the jury all points contained in the special charges. Defendant has not shown that he suffered any prejudice by reason of the refusal of the trial judge to deliver the special instructions to the jury; we likewise find that he suffered no prejudice. No abuse of discretion was committed by the trial judge. Specification of Error "E" is without merit.

*Specification of Error "F"* recites:

"The trial court erred in denying defendant's motions concerning the fatally defective verdict."

The Minutes of the trial court of November 6, 1969, recite, in part:

"After the Court delivered its charge to the Jury, the Court discharged the alternate juror, Doyle W. Harrison, and the Jury returned to the Jury Room, in charge of the Sheriff, to consider their verdicts. The Court filed its written charge to the Jury. The Jury returned into open court and was asked by the Court if they had reached a verdict. The Jury, through their Foreman, Ennis Conway Watson, answered in the affirmative. The Jury, upon their Oath, does say: '10–6–69 82,130—We the jury find the Defendant Guilty. (Signed) James W. Cowan (Signed) John M. Humphries. 82,131—We the jury find the Defendant Guilty. 10–6–69 (Signed) James W. Cowan (Signed) John M. Humphries. 82,132—We the jury find the Defendant Guilty. 10–6–69 (Signed) James W. Cowan (Signed) John M. Humphries. (Signed) E. C. Watson. 82,133—We the jury find the Defendant Guilty. 10–6–69 (Signed) James W. Cowan (Signed) John M. Humphries. * * * The verdicts were read aloud by the Clerk and the defendant, H. Lane Mitchell, was present with his counsel when the Jury returned the verdicts and when the verdicts were read. On the request of counsel for H. Lane Mitchell, the Jury was polled in each case and in all five (5) cases all five (5) jurors answered 'Yes' that this was their verdict. [We are not herein concerned with Case No. 82,134, the fifth case.] Whereupon, the Court ordered the verdicts recorded, the Jury discharged, and the defendant,

H. Lane Mitchell, remanded to jail to await sentence. The defendant, H. Lane Mitchell, having been taken to jail and the Jury having left the Courtroom, the defendant, H. Lane Mitchell, and the Jury were brought back to the Courtroom. Counsel for H. Lane Mitchell and the District Attorney being present and the Judge presiding, court was called to order. Counsel for H. Lane Mitchell made a motion for a mistrial on grounds that the verdicts were incorrectly dated (10-6-69) and that the verdicts in Cases No. 82,130, 82,131, and 82,133 were not signed by the Foreman, which motion for mistrial was objected to by the District Attorney. Said motion for mistrial was overruled, * * * The Court ordered the Sheriff to adjourn court and that the defendant, H. Lane Mitchell, be remanded to jail."

Counsel for the defendant contend that the verdicts herein rendered are a nullity. They argue that the mandatory proceedings of LSA–C.Cr.P. 810 were not complied with, and that the polling in this case did not vary or alter the error committed. They submit that the verdict was improperly dated and not signed before the polling, and further that it was improperly dated and not signed after the polling.

LSA–C.Cr.P., Art. 810, provides:

"When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. There shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury.

"The foreman of the jury shall deliver the verdict to the judge in open court."

LSA–C.Cr.P., Art. 812, provides:

"The court shall order the clerk to poll the jury if requested by the state or the defendant.

"Polling the jury consists of the clerk's calling each juror, one at a time, by name. He shall announce to each juror the verdict returned, and ask him, 'Is this your verdict?' Upon receiving the juror's answer to the question, the clerk shall record the answer.

"If, upon polling all of the jurors, the number of jurors required by law to find a verdict answer 'Yes,' the court shall order the clerk to record the verdict and the jury shall be discharged. If, upon polling all of the jurors, the number required to find a verdict do not answer 'Yes,' the jury may be remanded for further deliberation, or the court may declare a mistrial in accordance with Article 775."

▪ The Minutes of the trial court reflect that the instant verdicts were return-

ed on November 6, 1969. The clerical error of dating the verdicts "10–6–69" is of no consequence; it does not constitute reversible error. Instead of being recited as "11–6–69," the date was set out as "10–6–69," a human clerical error which occurs on many occasions in the ordinary course of events.

 The non-compliance herein with the provisions of LSA–C.Cr.P., Art. 810, is also of no consequence. The jurors were polled in the presence of defendant and his counsel, who were aware of the verdicts in no uncertain terms. The polling of the jury cured the clerical non-compliance with the provisions of LSA–C.Cr.P., Art. 810, as to the three verdicts (with which we are herein concerned) not signed by the foreman of the jury. It is well to remember that the jurors were laymen; they were not furnished with a copy of the judge's charge to the jury in this case and therefore had to rely upon their memories as to their instructions. The cases having been consolidated and tried together, it was a reasonable oversight by the foreman not to have signed the three verdicts. Under the facts and circumstances surrounding this matter, the failure of the foreman to sign three of the verdicts rendered herein does not constitute reversible error. Prejudice has not been shown. Specification of Error "F" is without merit.

For the reasons assigned, the convictions and sentences are affirmed.

BARHAM, J., concurs in the result.

TATE, J., concurs in the result and joins in DIXON, J.'s concurring opinion.

DIXON, Justice (concurring).

I concur in the majority opinion, but would add observations concerning Specification of Error "B." The defendant complained that there was error in denying his motions to the district attorney and others to produce copies of income tax returns, etc. The possible substantial complaint which can be noted in the bills relative to Specification of Error "B" relates only to the failure of the defendant in his efforts to obtain a subpoena duces tecum ordering accomplices of defendant to produce their income tax returns.

A request was made during the trial to order an accountant to produce income tax returns. Such information in the hands of an accountant is privileged. R.S. 37:85.

Other requests were made in advance of trial for production at trial. Because of the argument of the district attorney, and the rulings of the judges in the trial court (different judges presided from time to time at pre-trial hearings; one judge presided at the trial on the merits) it is appropriate to note the procedure for obtaining a subpoena duces tecum.

In the Code of Criminal Procedure article 731 provides:

"The court shall issue subpoenas for the compulsory attendance of witnesses at hearings or trials when requested to do so by the state or the defendant. Clerks of court may issue subpoenas except as provided in Articles 739 and 740."

Article 732 provides:

"A subpoena may order a person to produce at the trial or hearing, books, papers, documents, or any other tangible things in his possession or under his control, if a reasonably accurate description thereof is given; but the court shall vacate or modify the subpoena if it is unreasonable or oppressive."

The issuance of a subpoena duces tecum is mandatory, and not discretionary. Subpoenas shall be issued by the court or by the clerk. It is true, as argued by the district attorney, that the defendant did not order a subpoena duces tecum from the clerk. It would have been vain, and possibly reprehensible, for him to have done so, the judge having previously refused the request. The relevance of the documents sought to be brought into court is not open to inquiry, unless the subpoena requested is obviously unreasonable or oppressive. If an unreasonable or oppressive subpoena issues, the judge is required to vacate or modify it.

Nevertheless, denial of the defendant's request for a subpoena duces tecum to produce income tax returns of the defendant's accomplices was harmless error. Code of Criminal Procedure article 921:

"A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

Defendant was not denied the presence of any witness sought. If we assume that the income tax returns sought by the defendant represented the illicit income of his accomplices, it remains a fact that such information would lack substantial probative value. At issue was the guilt or innocence of the defendant. The wrongdoing of the accomplices was by them admitted. Regardless of what their income tax returns showed, each testified that he participated in obtaining funds illegally, in which the defendant shared. If a witness testifies under oath that he stole, his failure to report the stolen funds on his income tax return would not weaken his confession in court, under oath; reporting stolen funds in full would not show that he did not share them with another person. Defendant has not been substantially prejudiced by his failure to obtain the income tax returns of his accomplices.